UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF INDIANA
SOUTH BEND DIVISION

TOM R. PRUITT,                          )
                                        )
                    Petitioner,         )
                                        )
        vs.                             )        CAUSE NO. 3:09cv380RLM
                                        )
BILL WILSON, SUPERINTENDENT             )
                                        )
                    Respondent          )

OPINION and ORDER

An Indiana jury convicted Tom Pruitt of murdering a deputy sheriff and the judge sentenced Mr. Pruitt to death. In this habeas corpus petition under 28 U.S.C. § 2254, Mr. Pruitt brings a number of claims in which he contends that the state of Indiana violated his constitutional rights in connection with its prosecution and imposition of the death penalty. The court heard oral argument on the petition on September 14, 2012. The court thanks attorneys Marie Donnelly and Laurence Komp, who agreed to represent Mr. Pruitt on this petition, for their excellent briefs and argument. Deputy Attorneys General Stephen Creason and James Martin provided equally proficient and professional representation to the State of Indiana.

Most of this petition focuses on the following: the Eighth Amendment prohibits capital punishment for mentally retarded individuals. The Indiana courts found that Mr. Pruitt was not mentally retarded, and have ordered his execution. For the reasons set forth below, the court denies Mr. Pruitt's petition. Mr. Pruitt

contends that whether due to constitutionally insufficient performance by his attorneys in the Indiana courts, or unreasonable fact-finding or application of the law in the Indiana courts, the finding that he is not mentally retarded cannot stand. Under any view, Mr. Pruitt is borderline — either a high functioning mentally retarded individual, or an individual with very low average intelligence. The Indiana courts faced the challenge of deciding where Mr. Pruitt fits on that imprecise continuum. As explained more fully in the following opinion, this record supports no finding that the Indiana courts acted unreasonably in making that decision, or that Mr. Pruitt's attorneys provided anything short of effective assistance as the Indiana courts made that decision. Accordingly, the court denies Mr. Pruitt's petition.

## I. BACKGROUND

Mr. Pruitt's erratic driving on June 14, 2001 caught Morgan County Deputy Sheriff Daniel Starnes's attention. Deputy Starnes, who was accompanied by his college-aged son, was on routine patrol. Deputy Starnes observed increasingly erratic driving as he followed Mr. Pruitt for some distance. When Mr. Pruitt eventually stopped, Deputy Starnes pulled in behind him, turned on his flashing lights, and got Mr. Pruitt's license and registration. Deputy Starnes called in the information and learned that a recent robbery report suggested that Mr. Pruitt might have stolen weapons with him. Deputy Starnes started back to Mr. Pruitt's

car. Mr. Pruitt came out firing. Deputy Starnes fired back. Deputy Starnes was shot five times; Mr. Pruitt was shot seven times. Deputy Starnes was flown to Methodist Hospital and underwent surgery.

The next day, the state charged Mr. Pruitt with two counts of attempted murder (Mr. Pruitt had fired shots at the deputy's son, too), possession of a firearm by a serious violent felon, two counts of possession of a handgun without a license, resisting law enforcement, and three counts of receiving stolen property.

An infection set in after Deputy Starnes was removed from intensive care, and he died 26 days after the shooting. The state amended the attempted murder count that day to charge Mr. Pruitt with murder, and added another count of receiving stolen property. About a month and half later, the state requested the death penalty because Deputy Starnes had been a law enforcement officer engaged in his duties. *See* IND. CODE § 35-50-2-9(b)(6).

Dearborn County Circuit Judge James D. Humphrey appointed William Van Der Pol, Jr. and Douglas Garner to represent Mr. Pruitt at trial. Mr. Pruitt moved to preclude the death penalty under <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002), contending he suffered from mental retardation. At the hearing on the motion, Mr. Pruitt's expert witnesses — clinical psychologist and neuropsychologist Dr. Bryan Hudson and professor of psychology Dr. Charles Golden — testified that Mr. Pruitt was mentally retarded based on IQ tests and assessments of adaptive functioning. Mr. Pruitt presented non-expert testimony and records about how his

developmental disability had affected his ability to function. The trial court's appointed expert, Dr. George Schmedlen, testified that Mr. Pruitt wasn't mentally retarded, citing evidence that included IQ tests, achievement tests, an assessment of his adaptive function and ability to hold jobs and perform various tasks. Dr. Schmedlen testified that certain IQ scores for Mr. Pruitt obtained after Mr. Pruitt's arrest for Deputy Starnes's murder were invalid as the result of malingering. The state's expert, Dr. Martin Groff, agreed that Mr. Pruitt wasn't mentally retarded. Judge Humphrey found that Mr. Pruitt wasn't mentally retarded and denied Mr. Pruitt's motion. (PC App. 848).[1]

At trial, Mr. Pruitt didn't dispute having shot Deputy Starnes. The defense centered on cause of death, arguing that the deputy died from a severe sepsis infection rather than the gunshots. At Mr. Pruitt's request, Judge Humphrey instructed the jury on aggravated battery as a lesser included offense of murder. The jury found Mr. Pruitt guilty of the murder of Deputy Starnes, aggravated battery, the attempted murder of Deputy Starnes's son, the unlicensed possession of a firearm, resisting law enforcement, and four counts of receiving stolen property.

At the penalty phase, the defense presented evidence of Mr. Pruitt's background and mental retardation. Drs. Hudson and Golden testified that Mr. Pruitt is mentally retarded. Dr. Golden also reported that in January 1996, federal

---

[1] "PC App." refers to the appendix Mr. Pruitt submitted to the Indiana Supreme Court on post-conviction review.

Bureau of Prisons doctors had diagnosed Mr. Pruitt with schizotypal personality disorder and that in August 2001, an Indiana Department of Corrections psychologist had diagnosed and treated Mr. Pruitt for schizophrenia. Dr. Golden diagnosed Mr. Pruitt as suffering from schizotypal personality disorder (a personality disorder with no psychotic symptoms present).

Over Mr. Pruitt's objection, Judge Humphrey instructed the jury about the governor's power to grant a reprieve, commutation, or pardon to a person convicted and sentenced for murder. Judge Humphrey declined two instructions Mr. Pruitt requested: an instruction that the jury must decide whether the only aggravating circumstance charged outweighed the mitigating circumstances beyond a reasonable doubt, citing Ring v. Arizona, 536 U.S. 584 (2002), and an instruction that the jury must decide on Mr. Pruitt's mental retardation before it could make a finding on the death penalty, citing Ring v. Arizona, supra, and Atkins v. Virginia, 536 U.S. 304 (2002).

The jury found the state had proven the charged aggravating circumstances — that Mr. Pruitt killed a law enforcement officer in the course of his duties — found that the aggravating circumstance outweighed the mitigating circumstances, and recommended a death sentence. Judge Humphrey sentenced Mr. Pruitt to death for the murder and to an aggregate term of 115 years for the other counts.

Teresa Harper and trial counsel William Van Der Pol represented Mr. Pruitt on his direct appeal and argued (among other things) that: (1) the death sentence violated the Eighth Amendment because Mr. Pruitt is mentally retarded; (2) the exclusion of defense witness Michelle Calderone violated Mr. Pruitt's constitutional right to present a defense; (3) Judge Humphrey erred when he admitted gruesome photographs; (4) instructing the jury as to the possibility of executive clemency violated Mr. Pruitt's rights under the Eighth and Fourteenth Amendments; and, (5) under the Sixth and Fourteenth Amendments, the jury should have been required to find that aggravating factors outweighed the mitigating factors beyond a reasonable doubt. The Indiana Supreme Court affirmed Mr. Pruitt's convictions and death sentence over Justice Rucker's dissent.[2] Pruitt v. State, 834 N.E.2d 90 (Ind. 2005) ("Pruitt I"). Justice Dickson wrote a concurring opinion in which Chief Justice Shepard joined.

Mr. Pruitt petitioned the Dearborn Circuit Court for post-conviction relief. Judge Humphrey held an evidentiary hearing and then denied both the petition for post-conviction relief and Mr. Pruitt's ensuing motion to correct errors. The Indiana Supreme Court affirmed the denial of post-conviction relief, again over Justice Rucker's dissent. State v. Pruitt, 903 N.E.2d 899 (Ind. 2009), rehearing denied (June 16, 2009) ("Pruitt II").

---

[2] Justice Rucker concluded that Mr. Pruitt proved by a preponderance of the evidence that he is mentally retarded as defined by Indiana law. Pruitt v. State, 834 N.E.2d 90, 123 (Ind. 2005).

Mr. Pruitt petitions this court for relief under 28 U.S.C. § 2254. He raises eight arguments (after abandoning a ninth[3] during briefing): (1) The Eighth Amendment bars his execution because he is mentally retarded; (2) his trial counsel were ineffective for failing to investigate adequately and present readily available evidence of his mental retardation at the pre-trial mental retardation hearing and at the trial's penalty phase; (3) Judge Humphrey's exclusion of a witness during the guilt phase violated Mr. Pruitt's Sixth and Fourteenth Amendment right to present a defense; (4) an improper jury instruction about the possibility of a pardon or commutation violated Mr. Pruitt's rights under the Sixth, Eighth, and Fourteenth Amendments; (5) Mr. Pruitt's trial counsel were ineffective for failing to investigate competently and present readily available mitigating evidence at the trial's penalty phase; (6) Mr. Pruitt's trial counsel were ineffective for failing to investigate and present readily available evidence in support of a verdict of guilty but mentally ill; (7) Mr. Pruitt's trial counsel's failure to object to prosecutorial misconduct in jury argument and appellate counsel's failure to raise such issues during petitioner's direct appeal resulted in a violation of his rights under the Sixth, Eighth, and Fourteenth Amendments; and (8) Mr. Pruitt's death sentence was obtained in violation of his Sixth Amendment right to a trial by jury and his right to due process of law because the jury wasn't instructed that it had

---

[3] Mr. Pruitt withdrew Claim IV regarding the admission of a gruesome photograph. (Doc. No. 31 at 61).

to find that the aggravating circumstances outweighed the mitigating circumstance beyond a reasonable doubt.

## II. STANDARD OF REVIEW

Federal habeas relief can be granted only if the state court's decision was "contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States" or "based on an unreasonable determination of the facts in the light of the evidence presented." 28 U.S.C. § 2254(d); Morgan v. Hardy, 662 F.3d 790, 797-798 (7th Cir. 2011) (*citing* Williams v. Taylor, 529 U.S. 362, 364-365 (2000); Charlton v. Davis, 439 F.3d 369, 374 (7th Cir. 2006)).

Seizing on the construction of a sentence in Williams v. Taylor, 529 U.S. at 412 (§ 2254(d) "places a new constraint on the power of a federal habeas court to a state prisoner's application for a writ of habeas corpus with respect to claims adjudicated on the merits in state court"), Mr. Pruitt argues that the court must first decide, without reference to § 2254(d), whether a constitutional violation occurred, and if so, turn then to § 2254(d) to see whether relief can be granted. (Doc. No. 31 at 3-4). The statute doesn't require a habeas court to do so, and other decisions don't seem to have engaged in such discrete analyses. *See, e.g.*, Price v. Thurmer, 637 F.3d 831, 839 (7th Cir. 2011) (*citing* Harrington v. Richter, ——U.S. ——, 131 S. Ct. 770, 786-787 (2011)).

## III. DISCUSSION

### A. Claim I: Mental Retardation

Mr. Pruitt argues that he is mentally retarded and that his sentence of death therefore violates the Eighth Amendment's prohibition against cruel and unusual punishments as set forth in <u>Atkins v. Virginia</u>, 536 U.S. 304 (2002). He asks that his death sentence be vacated and his case remanded for resentencing to a sentence other than death.

Judge Humphrey rejected this claim on its merits after considering evidence entered during a week-long pre-trial hearing. The Indiana Supreme Court affirmed on direct appeal. Mr. Pruitt also raised this claim in his post-conviction petition, and the trial court and the Indiana Supreme Court rejected the argument on post-conviction review as well. Mr. Pruitt contends that the Indiana Supreme Court's decisions on this issue are based on an unreasonable determination of facts presented in state court under § 2254(d)(2) and are based on an unreasonable application of clearly established United States Supreme Court law under § 2254(d)(1).

Indiana state law prohibits a death sentence for mentally retarded individuals. *See* IND. CODE § 35-36-9-6. Indiana law defines an "individual with mental retardation" as "an individual who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior." IND. CODE § 35-36-9-2. A defendant

must prove both prongs of Indiana's statutory test to be deemed mentally retarded Id. To decide what constitutes "significantly subaverage intellectual functioning," Indiana courts often look, in part, to IQ tests, as set forth in guidance from by the Association on Mental Retardation (AAMR) and the American Psychiatric Association's Diagnostic and Statistical Manual, 4th ed. (DSM-IV). State v. McManus, 868 N.E.2d 778, 785 (Ind. 2007). Under these definitions, a person can meet the "subaverage intellectual functioning component if the person's full-scale IQ test score is two standard deviations below the mean; *i.e.,* an IQ between 70 and 75 or lower." Id. (*quoting* Woods v. State, 863 N.E.2d 301, 304 (Ind. 2007)). Courts also "consider IQ scores together with other evidence of mental capacity." Pruitt I, 834 N.E.2d at 106.

Four experts testified at Mr. Pruitt's pre-trial hearing on mental retardation: Dr. George Schmedlen, Ph.D. (the expert appointed by the trial court); Dr. Brian Hudson, Ph.D. (one of Mr. Pruitt's experts); Dr. Charles Golden, Ph.D. (the other of Mr. Pruitt's experts); and Dr. Martin Groff, Ph.D. (the state's expert). Mr. Pruitt had been administered a number of intelligence and scholastic tests during his lifetime, both pre- and post-incarceration for the instant offense. The Indiana Supreme Court summarized the evidence presented during the hearing and the trial court's conclusions about Mr. Pruitt's intelligence testing.

> As a child, Pruitt was given two Lorge-Thorndike group administered IQ tests. In March 1973, he scored a verbal IQ of 64, and a non-verbal IQ of 65. In December of 1976, he scored a verbal IQ of 64 and a non-verbal IQ of 63. The state's expert, Dr. Martin

Groff, concluded that he would give little weight to these results. The state points out that both Dr. Brian Hudson, Pruitt's witness, and Dr. Groff testified that the Lorge-Thorndike is a group-administered test and because group-administered tests tend to obscure the individual, individual tests are a better indicator of an individual's ability.

Pruitt was also given two academic achievement tests while in school. In March 1975, Pruitt took an Otis-Lennon School Ability Test and scored 81. Dr. George Schmedlen, the court's expert, testified that this score was inconsistent with the claim that Pruitt is mentally retarded. Other experts disagreed. Dr. Hudson testified that academic achievement tests differ from IQ tests in that IQ tests gauge true intellectual ability while academic achievement tests gauge how well someone has learned school materials. One of the defense experts testified that although academic achievement tests can be used as a tool to corroborate IQ, they cannot be used as a substitute and may vary as much as 15 to 25 points from a person's true IQ. Pruitt also argues that Dr. Schmedlen's testimony is inaccurate. Pruitt cites his own expert who explained that academic achievement tests compare individuals in the same grade in school, while IQ testing compares persons of the same age. Pruitt points out that by the time he took the Otis-Lennon test, he had been held back two years in school and was therefore two years older than his classmates. Pruitt argues that when his Otis-Lennon results are compared to children of his own age, those results produce a score almost identical to the Lorge-Thorndike tests he took and are clearly within the mentally retarded range. Dr. Schmedlen also testified that the results of Pruitt's Iowa Basic Test in the fifth grade were consistent with his Otis–Lennon scores. Pruitt again argues that this test is an academic achievement test and that Schmedlen incorrectly failed to score age. Pruitt argues that if his age had been considered when scoring the Iowa Basic Test, that test would have also produced a result almost identical to the Lorge–Thorndike test. Pruitt concludes that when taken as a whole, the academic testing results in an average grade equivalent within the range expected for a mildly mentally retarded individual.

Pruitt was also administered intelligence tests after his schooling. While in prison for an earlier crime, Pruitt was administered a Revised Beta intelligence test and scored a 93. Citing expert testimony and a recognized journal, *Mental Retardation,* Pruitt argues that this test is "wildly inaccurate" because it focuses on non-language functioning and does not consider language functioning. In

April of 2002, Pruitt took the Weschler Adult Intelligence Scale (WAIS) and scored a full scale IQ of 76. The trial court found "this test result would place Mr. Pruitt above the level set on this particular test for mental retardation." The WAIS has a standard error of measurement of five points, so Pruitt scored within the range of 71 to 81. Dr. Hudson testified that he believed there was a one-point error in scoring and that he believed Pruitt was under the influence of the antipsychotic medication Trilifon at the time he took the test and the medication superficially increased his ability, resulting in an over-estimation in that test by three to six points. Pruitt argues that the testimony of Dr. Golden and the medical literature both support this conclusion. The state counters that even Pruitt's expert, Dr. Hudson, stated that the score was an accurate reflection of Pruitt's IQ at the time and that the medication does not raise one's IQ, but simply provides a better testing environment. The state also points out that the trial court specifically found that there was insufficient evidence "as to what, if any, effect this medication may have had on Mr. Pruitt's testing results."

Finally, Pruitt was twice tested recently. On July 22, 2003, Dr. Schmedlen administered the WAIS to Pruitt. Pruitt scored a full-scale IQ of 52. However, Dr. Schmedlen testified that he did not believe that Pruitt was working up to his potential when he took the WAIS and the test was therefore not an accurate measure of his intellectual functioning. The trial court found that Pruitt "did *not* work to his full potential on this intelligence test, that he was, in fact, malingering." (emphasis in original). In February of 2003, Pruitt took a Stanford-Binet individually administered IQ test and scored a 65. On the Stanford–Binet test, significantly subaverage intelligence is a score less than 69. Pruitt argues that his score of 65 falls clearly within the range of mentally retarded and the Stanford–Binet test was identified by both Drs. Golden and Hudson as more sensitive and accurate in individuals with very high or very low IQ than the WAIS. The state points out that Golden acknowledged that alternative methods of scoring the test could have resulted in a score of 69. Other alternate scoring would have resulted in a score of 67. The test has a standard error of measure of six points, so Pruitt scored within the range of 59-71 and Pruitt is therefore within the margin of error of the cutoff.

Pruitt I, 834 N.E.2d at 104-106.

The Indiana Supreme Court affirmed Judge Humphrey's conclusion that Mr. Pruitt didn't establish that he is mentally retarded under the "intellectual functioning" prong of Indiana's statutory test for mental retardation. The court noted that Mr. Pruitt's functioning was, at worst, borderline rather than mentally retarded. Id. at 103-104. The court approved of Judge Humphrey's reliance on non-IQ test evidence (such as employment performance and ability to complete various life tasks) to reach his conclusion about the intellectual functioning prong:

> IQ tests are only evidence; they are not conclusive on either the subject's IQ or the ultimate question of mental retardation. Rather, the statutory test is "significantly subaverage intellectual functioning." In determining whether an individual is or is not mentally retarded, the trial court may consider IQ scores together with other evidence of mental capacity. While some of Pruitt's scores suggest significantly subaverage intellectual functioning, others do not. In addition to this data, the trial court found that Pruitt was able to fill out applications for employment and to have the capacity, if not the will at all times, to support himself. In light of the inconsistent IQ scores and the other evidence cited by the trial court, the trial court's finding that Pruitt did not meet the statutory test is consistent with this record.

Id. at 106.

As to the "adaptive functioning" prong, the supreme court held that "because the adaptive behavior standard applied by Judge Humphrey was too restrictive, the trial court's finding on that prong is not supportable." Id. at 110. But because a finding of mental retardation requires a showing of both significantly subaverage intelligence and significant limitations in adaptive functioning, the court held that Judge Humphrey's error with respect to the

adaptive functioning prong was inconsequential to the ultimate finding that Mr. Pruitt is not mentally retarded under Indiana law. Id. The supreme court affirmed based only on its finding as to the intellectual functioning prong. Mr. Pruitt's Eighth Amendment claim rests entirely on the Indiana Supreme Court's assessment of the intellectual functioning prong.

After Mr. Pruitt filed his petition for post-conviction relief, Judge Humphrey heard mental retardation experts Dr. Dennis Keyes and Dr. Dennis Olvera testify that Mr. Pruitt is mentally retarded; heard a former Director of Special Education for Indianapolis Public Schools (Dr. Mary Jo Dare) testify that Mr. Pruitt's academic testing and performance fit the profile of a mildly mentally handicapped individual; and heard expert testimony from Marie Dausch that people with mild mental retardation can find employment and get a driver's license (even a commercial driver's license). Dr. Keyes administered a Stanford-Binet intelligence test to Mr. Pruitt in December 2006 and testified that Mr. Pruitt scored a 64. Dr. Olvera testified that when he administered the March 2002 WAIS to Mr. Pruitt he concluded that Mr. Pruitt wasn't mentally retarded because Mr. Pruitt's score of 76 didn't meet the intelligence functioning standard. But at the time of the post-conviction hearing Dr. Olvera testified that he believed that Mr. Pruitt is mentally retarded in light of his review of additional test results.

Judge Humphrey found Mr. Pruitt's post-conviction argument that he is mentally retarded unavailing, concluding that the doctrine of *res judicata* barred

Mr. Pruitt's renewed challenge: the issue had been thoroughly raised, argued and adjudicated on direct appeal. (PC App. at 688). Judge Humphrey also noted that "the additional evidence that Pruitt presented at the post-conviction hearing was largely cumulative of the evidence developed before and [during] trial and is entirely unpersuasive." (Id.). Judge Humphrey said that he found the newly offered testimony regarding the "Flynn Effect" to be "particularly unpersuasive." (Id. at 689). The Indiana Supreme Court affirmed, again over Justice Rucker's dissent. Pruitt II, 903 N.E.2d at 938.

Mr. Pruitt presents three nuanced mental retardation Eighth Amendment arguments in his briefing. First, he argues that the Indiana Supreme Court's determination that he is not mentally retarded violates the Eighth Amendment under Atkins. *Second*, Mr. Pruitt argues that the Indiana Supreme Court's determination that he isn't mentally retarded violates the Eighth Amendment under a series of Eighth Amendment cases prohibiting implementation of the death penalty in an "arbitrary and capricious" manner. Third, Mr. Pruitt argues that the state court made an unreasonable determination of the facts in light of the evidence presented about his mental retardation claim.

### 1. Contrary To / Unreasonable Application Of Atkins

Mr. Pruitt argues that the Indiana Supreme Court's determination that he is not mentally retarded violates clearly established Eighth Amendment law in

light of the United States Supreme Court's holding in Atkins v. Virginia. The Atkins Court held that the death penalty cannot be imposed on mentally retarded individuals. 536 U.S. at 321. The Court observed that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus." Id. at 317. The Court didn't define what it means to be "mentally retarded," instead "leav[ing] to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." Id. (*quoting* Ford v. Wainwright, 477 U.S. 399, 405, 416-417 (1986)).

Even before Atkins, Indiana law prohibited imposing the death sentence on people with mental retardation. *See* IND. CODE § 35-36-9-6. Indiana law defines an "individual with mental retardation" as "an individual who, before becoming twenty-two (22) years of age, manifests: (1) significantly subaverage intellectual functioning; and (2) substantial impairment of adaptive behavior." Ind. Code § 35-36-9-2. Aside from a too demanding burden of proof,[4] the Pruitt I court decided that Indiana's statutory definition and procedures concerning the execution of mentally retarded individuals passed constitutional muster under Atkins. Pruitt I, 834 N.E.2d at 108 ("We conclude that the Indiana statute does not impose a

---

[4] As originally enacted, Indiana Code § 35-36-9-4 required a defendant to "prove by clear and convincing evidence that the defendant is a mentally retarded individual." *See* Ind. Acts 1851-52 (codified at Ind. Code. Ann. § 35-36-9-4 (West 2004)). In Mr. Pruitt's first appeal, the Indiana supreme court determined that the "clear and convincing" requirement was unconstitutional in light of Atkins and lowered the burden of proof to a preponderance of the evidence standard. Pruitt I, 834 N.E.2d at 103.

standard incompatible with the Eighth Amendment as explained in <u>Atkins</u>. Rather, it is within the flexibility allowed by the consensus found in <u>Atkins</u>.").

<u>Atkins v. Virginia</u> simply held that it is unconstitutional under the Eighth Amendment to execute a mentally retarded defendant. The Court didn't specify a legal definition of "mental retardation"; the states were expected to develop methods to protect this constitutional safeguard adequately. 536 U.S. at 317. In the post-<u>Atkins</u> realm of mental retardation and the death penalty, then, the existence of a constitutional prohibition is clear, but its parameters are less clear.

While the <u>Atkins</u> Court furnished no definitive legal definition of mental retardation, the Court used a footnote to signal its approval of two clinical definitions—the "mental retardation" standards of the AAMR and the American Psychiatric Association's DSM-IV:

> The American Association on Mental Retardation (AAMR) defines mental retardation as follows: *"Mental retardation* refers to substantial limitations in present functioning. It is characterized by significantly subaverage intellectual functioning, existing concurrently with related limitations in two or more of the following applicable adaptive skill areas: communication, self-care, home living, social skills, community use, self-direction, health and safety, functional academics, leisure, and work. Mental retardation manifests before age 18."

> The American Psychiatric Association's definition is similar: "The essential feature of Mental Retardation is significantly subaverage general intellectual functioning (Criterion A) that is accompanied by significant limitations in adaptive functioning in at least two of the following skill areas: communication, self-care, home living, social/interpersonal skills, use of community resources, self-direction, functional academic skills, work, leisure, health, and safety (Criterion B). The onset must occur before age 18 years (Criterion C).

> Mental Retardation has many different etiologies and may be seen as a final common pathway of various pathological processes that affect the functioning of the central nervous system."

Atkins v. Virginia, 536 U.S. at 308 n.3. The Court noted further that state statutory definitions of mental retardation then in place, including Indiana's statute, generally conformed to these clinical definitions. Id. at 314 and 317 n.22. Mr. Pruitt's briefing contains no suggestion that Indiana's statutory scheme doesn't comport with Atkins' holding that states not execute the mentally retarded.

Mr. Pruitt can't show that the Indiana Supreme Court's adjudication of his claim was an unreasonable application of Atkins v. Virginia. The Atkins Court in Atkins left to the states the task of determining whether defendants are mentally retarded such that their execution is barred under the Eighth Amendment. Id. Indiana chose to follow generally the clinical definitions that the Court cited with approval. See id. at 314 and 317 n.22. This court can't say that the state courts' determination that Mr. Pruitt is not mentally retarded contravenes clearly established federal law because no clearly established federal law defining mental retardation exists beyond a general approval of clinical definitions. See id. at 317.

## 2. Contrary To / Unreasonable Application Of Eighth Amendment
### "Arbitrary And Capricious" Case Law

Next, Mr. Pruitt argues that the Indiana Supreme Court's determination that he isn't mentally retarded violates clearly established Eighth Amendment law requiring that the death penalty not be imposed in an arbitrary and capricious manner, including the effectuation of _Atkins_' prohibition against executing mentally retarded individuals. In his traverse brief, Mr. Pruitt cites a line of death penalty cases that hold that imposing the death penalty in an arbitrary and capricious manner violates the Eighth Amendment's prohibition against cruel and unusual punishment. _See_ Furman v. Georgia, 408 U.S. 238 (1972) (holding that death penalty may not be imposed under sentencing procedures that create a substantial risk that the punishment will be inflicted in an arbitrary and capricious manner); Gregg v. Georgia, 428 U.S. 153 (1976) (holding that a capital sentencing scheme must provide a "meaningful basis for distinguishing the few cases in which [the penalty] is imposed from the many cases in which it is not"); and Godfrey v. Georgia, 446 U.S. 420 (1980) (holding that death penalty aggravating factor of "outrageously or wantonly vile, horrible and inhuman" crime so vague as to permit uncontrolled discretion in sentencing death).

Mr. Pruitt contends that the Indiana courts conflated two distinct prongs of Indiana's statutory definition of mental retardation, resulting in a statutory application that is "a vague, unsupported conflation of the mental retardation standard that is likely to lead to the arbitrary and capricious imposition of the

death penalty, in violation of the Eighth Amendment." (Doc. No. 31 at 19). Mr. Pruitt argues that Judge Humphrey and the supreme court considered evidence of adaptive behavior to reach conclusions about his intellectual functioning when such evidence should be confined to the adaptive behavior prong of Indiana's statutory definition of mental retardation.

Fundamentally, Mr. Pruitt takes issue with Indiana Supreme Court's having approved consideration, as evidence that Mr. Pruitt did not meet the intellectual functioning criteria, of evidence of intellectual capacity unrelated to IQ testing such as Mr. Pruitt's ability to fill out job applications and maintain some level of employment at various times. Pruitt I, 834 N.E.2d at 106. Judge Humphrey also cited Mr. Pruitt's "functioning work history, school history," and his "ability to pass the Indiana CDL test." (PC App. at 854-55).

Mr. Pruitt argues that "a state's definition of mental retardation, when applied for the purposes of determining eligibility for the imposition of a death sentence, must be tailored and applied in a manner that avoids arbitrary and capricious infliction of the death penalty." (Doc. No. 31 at p. 43). He maintains that the Indiana Supreme Court effectively has augmented Indiana's statutory definition of a mentally retarded individual in such a way as to, at least as applied in this case, create a substantial risk that the death penalty will be inflicted in an arbitrary and capricious manner. Mr. Pruitt points to what he sees as the court's "focusing on isolated abilities such [as] passing a driver's test or filling out job

applications" which has "injected arbitrary factors to the legislatively created definition of mental retardation." (Doc. No. 31 at 44). Mr. Pruitt also argues that "these criteria represent a view of mental retardation that is objectively false." (Id.).

The Indiana courts never addressed Mr. Pruitt's argument that considering evidence of intellectual capacity beyond IQ test scores in connection with the intellectual functioning prong results in an arbitrary and capricious infliction of the death penalty in violation of the Eighth Amendment. The Indiana Supreme Court didn't do so because Mr. Pruitt didn't raise the argument on direct appeal or on post-conviction review. In fact, Mr. Pruitt did not truly articulate this exact argument until his traverse brief. Mr. Pruitt has waived this argument. *See* Pole v. Randolph, 570 F.3d 922, 934 (7th Cir. 2009) (holding that to adequately present a claim to the state court so as to meet exhaustion requirements a habeas petitioner must "present both the operative facts and the legal principles that control each claim"); *see also* Whitehead v. Cowan, 263 F.3d 708, 730 n.5 (7th Cir. 2001) (finding argument not presented in original or amended habeas petitions to be waived).

Even if Mr. Pruitt's argument were preserved properly, it would lack merit because no clearly established federal law supports Mr. Pruitt's position. *See* 28 U.S.C. § 2254(d)(1). The cases Mr. Pruitt cites in his traverse brief hold that the Eighth Amendment demands that states not impose the death penalty in an arbitrary and capricious manner during the process of determining death-eligible

crimes. In <u>Gregg v. Georgia</u>, 428 U.S. 153, 195 (1976), the Supreme Court noted that the concern expressed in <u>Furman v. Georgia</u>, 408 U.S. 238 (1972), that the death penalty not be imposed in an arbitrary or capricious manner "can be met by a carefully drafted statute that ensures that the sentencing authority is given adequate information and guidance." In <u>Godfrey v. Georgia</u>, 446 U.S. 420, 428 (1980), the Supreme Court held that "if a State wishes to authorize capital punishment it has a constitutional responsibility to tailor and apply its law in a manner that avoids the arbitrary and capricious infliction of the death penalty." States must define death-eligible crimes "in a way that obviates 'standardless [sentencing] discretion.'" <u>Id.</u> (*quoting* <u>Gregg v. Georgia</u>, 428 U.S. at 196 n.47) (brackets in original). States must "channel the sentencer's discretion by clear and objective standards that provide specific and detailed guidance, and that make rationally reviewable the process for imposing a sentence of death." <u>Id.</u> (internal citations and quotation marks omitted). <u>Godfrey</u> dealt with the determination of whether a crime is eligible for the death penalty, not whether the defendant was mentally retarded and so exempted from the death penalty. The <u>Godfrey</u> Court held that a sentence of death based upon no more than a finding that the offense was "outrageously or wantonly vile, horrible and inhuman" violated the Eighth Amendment. <u>Id.</u>

Mr. Pruitt cites no case extending the holdings of <u>Furman</u>, <u>Gregg</u>, and <u>Godfrey</u> to a determination of mental retardation. <u>Furman</u>, <u>Gregg</u>, and <u>Godfrey</u>

addressed how crimes are selected as death-eligible crimes, not the decision of whether a defendant is mentally retarded. Even applying the Furman progeny to this case, Indiana's mental retardation test can't be said to allow for "standardless []discretion." *See* Godfrey v. Georgia, 446 U.S. at 428. The Indiana statute and corresponding case law define mental retardation, providing a standard premised on clinical definitions. *See* IND. CODE § 35-36-9-2. Indiana's standard is "rationally reviewable" by courts. *See* Godfrey v. Georgia, 446 U.S. at 428.

At bottom, Mr. Pruitt disputes the Indiana Supreme Court's interpretation of the Indiana statute defining mental retardation, arguing the court should have adhered more closely to clinical definitions of mental retardation. This court is not in a position to review and displace a state court's interpretation of its own law. Wilson v. Corcoran, ---U.S.----, 131 S. Ct. 13, 16 (2010) (per curiam) ("[W]e have repeatedly held that federal habeas corpus relief does not lie for errors of state law") (internal citations and quotation marks omitted); *see also* George v. Smith, 586 F.3d 479, 483-484 (7th Cir. 2009); Perruguet v. Briley, 390 F.3d 505, 511 (7th Cir. 2004) (errors of state law are "not cognizable on habeas review"). Even assuming Mr. Pruitt didn't default his claim that his death sentence violates the Eighth Amendment because it is arbitrary and capricious, federal law doesn't support the claim.

### 3. Unreasonable Determination Of The Facts

Mr. Pruitt argues that the evidence presented to the state courts demonstrated that he is mentally retarded and that the state courts unreasonably determined that he is not. A habeas petitioner's challenge to a factual determination "will not succeed if the petitioner merely evidences that the state court committed error. Instead, he must further establish that the state court committed unreasonable error." Ward v. Sternes, 334 F.3d 696, 703-704 (7th Cir. 2003). "[E]ven if '[r]easonable minds reviewing the record might disagree' about the finding in question, 'on habeas review that does not suffice to supersede the trial court's . . . determination.'" Wood v. Allen, ---U.S.---, 130 S. Ct. 841, 849 (2010) (*quoting* Rice v. Collins, 546 U.S. 333, 341-342 (2006)) (brackets and ellipsis in original). Mr. Pruitt and the state disagree about whether, to satisfy 28 U.S.C. § 2254(d)(2), a petitioner must establish only that the state court factual determination on which the decision was based was "unreasonable," or whether 28 U.S.C. § 2254(e)(1) further requires a petitioner to rebut a presumption that the determination was correct with clear and convincing evidence. The Supreme Court has expressly left this question open. Wood v. Allen, 130 S. Ct. at 849. This court needn't resolve the question either, because even reviewing Mr. Pruitt's claim under the more favorable § 2254(d)(2) standard, the Indiana Supreme Court's findings don't amount to an unreasonable determination of the facts in light of the evidence presented. *See* id.

Mr. Pruitt has identified the following facts supporting the Indiana Supreme Court's conclusion that he contends were incorrect: (1) Mr. Pruitt's IQ scores were "inconsistent"; and (2) Mr. Pruitt could "fill out applications for employment" and had "the capacity, if not the will at times, to support himself." (Doc. No. 31 at 28) (*quoting* <u>Pruitt I</u>, 834 N.E.2d at 106).

One bump in the road must be addressed first. The respondent argues that this court can't consider evidence presented during state court post-conviction proceedings when examining whether the state courts made unreasonable determinations of fact in connection with Mr. Pruitt's mental retardation claim, because that evidence was offered in connection with Mr. Pruitt's post-conviction ineffective assistance of counsel claims. (Doc. No. 27 at 10-11). The respondent suggests that the testimony presented in state post-conviction proceedings is "new" evidence that this court can consider only if Mr. Pruitt properly presented that evidence under 28 U.S.C. § 2254(e).

The respondent misses that the state courts considered evidence presented at the post-conviction hearing during post-conviction proceedings. The Indiana Supreme Court held that the additional evidence presented during the hearing about Mr. Pruitt's mental retardation didn't undermine the earlier determination that Mr. Pruitt isn't mentally retarded. <u>Pruitt II</u>, 903 N.E.2d at 938 ("We agree with the PC court that 'Pruitt has offered no evidence undermining the correctness' of the trial court's and this Court's findings that he is not mentally retarded.") The

Indiana Supreme Court, then, relied on the post-conviction evidence to dispose of this claim. The respondent offers no cases that stand for the proposition that this court can't consider evidence that the state courts properly heard, considered, and relied upon during post-conviction proceedings. This court will consider evidence of Mr. Pruitt's mental condition introduced during post-conviction proceedings.

*First*, Mr. Pruitt argues that the Indiana Supreme Court unreasonably concluded that his IQ scores were "inconsistent." The record supports that conclusion. Mr. Pruitt took two Lorge-Thorndike group-administered tests as a child, scoring a verbal IQ of 64 and non-verbal IQ of 65 in 1973 and a verbal IQ of 64 and non-verbal IQ of 63 in 1976. (Trial Tr. at 619). Dr. Groff testified that he gives little weight to group-administered tests, and Dr. Hudson agreed that individually administered tests are better indicators of ability. (Trial Tr. at 1459; 1357-58). In March 1975, Mr. Pruitt scored an 81 on the Otis-Lennon School Ability Test. (Trial Tr. at 620). Mr. Pruitt scored a 93 on a Revised Beta test in 1981. (Id.).

In April 2002, Dr. Olvera administered a WAIS-III to Mr. Pruitt, and Mr. Pruitt scored a full-scale IQ of 76. (Trial Tr. at 617). In July 2003, Dr. Schmedlen administered the WAIS-III, and Mr. Pruitt scored a full-scale IQ of 52. (Trial Tr. at 611). Dr. Schmedlen didn't think Mr. Pruitt was working up to his full potential, and so thought test wasn't an accurate measure of Mr. Pruitt's intellectual

functioning. (Trial Tr. at 617). In February 2003, Dr. Golden administered the Stanford-Binet to Mr. Pruitt, and Dr. Golden testified that Mr. Pruitt scored a full-scale IQ of 65, but Dr. Golden acknowledged that alternative scoring of the test would result in a 67 or 68. (Trial Tr. at 1504, 1595-1602, 1646). In connection with Mr. Pruitt's post-conviction hearing, Dr. Keyes administered the Stanford-Binet to Mr. Pruitt in December 2006, and Mr. Pruitt earned a full-scale IQ score of 64. (PC Tr. at 117).

This record reveals that Mr. Pruitt's IQ scores were, as the supreme court described them, inconsistent. Within a fifteen-month span, Mr. Pruitt's IQ scores ranged from 76 (April 2002) to 52 (July 2003) on the same test (WAIS-III). There is nothing unreasonable about the Indiana Supreme Court's determination that Mr. Pruitt's IQ scores were inconsistent.

Almost as an aside, Mr. Pruitt argues that the state courts were wrong to consider the Revised Beta score of 93 and the Otis-Lennon School Ability Test score of 81. (Doc. No. 31 at 33). Mr. Pruitt says that in Allen v. Buss, 558 F.3d 657 (7th Cir. 2009), the court of appeals rejected the Indiana Supreme Court's reliance on the Revised Beta test as the basis for finding a defendant to be not mentally retarded. That over-simplifies the holding in Allen v. Buss, in which the petitioner's mental retardation claim was procedurally postured much differently than Mr. Pruitt's claim.

The petitioner in <u>Allen</u> was sentenced to death before Indiana passed its 1994 statute precluding execution of the mentally retarded and before the United States Supreme Court decided <u>Atkins v. Virginia</u> in 2002, and so the petitioner had no opportunity for a hearing on whether he was mentally retarded under <u>Atkins</u> or Indiana law. <u>Id.</u> at 659. The court of appeals remanded the case to the district court for an evidentiary hearing to address whether the petitioner was mentally retarded under Indiana law. <u>Id.</u> at 665. The court of appeals noted in a footnote that it was rejecting the state's argument that Allen's mental retardation claim could be denied based on the record compiled in the state courts because "[t]here are disputes that cannot be resolved without a hearing," including the relevance and reliability of petitioner's score on a Beta test. <u>Id.</u> at 664 n.2. The court of appeals never held that state courts couldn't consider the Beta test among all the evidence concerning a defendant's mental capabilities. *See* <u>id.</u>

Mr. Pruitt also argues that the state courts "unreasonably refused to consider the Flynn [E]ffect" when assessing his IQ scores, particularly his score of 76 in April 2002 on the WAIS-III. (Doc. No. 31 at 34). Mr. Pruitt presented testimony about the Flynn Effect both during trial and during his post-conviction hearing. Dr. Olvera explained at the post-conviction hearing that the Flynn Effect is the steady rising of IQ scores over time. To counter this effect, IQ scores are "renormed" (made more difficult) every ten to fifteen years by resetting the mean score to 100 to account for previous gains in IQ scores. (PC Tr. at 41-42, 55). Mr.

Pruitt argues that "[w]hen considering the Flynn Effect, Pruitt's 76 score on the April of 2002 WAIS-III is reduced to approximately 74," bringing Mr. Pruitt's score within two standard deviations of 70, the mental retardation cut off. (Doc. No. 31 at 34).

The state courts heard conflicting evidence about the validity of the Flynn Effect. Mr. Pruitt's own witnesses conceded that there was disagreement about the acceptance of the theory as applied to individual scores. (*See* PC Tr. at 57-59 and PC App. at 674-75). The state courts had no obligation to accept and apply the Flynn Effect in the face of conflicting expert testimony about its acceptability and reliability as Mr. Pruitt would apply it. Testimony about the Flynn Effect doesn't render the Indiana Supreme Court's finding that Mr. Pruitt's IQ scores were "inconsistent" an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

*Second*, Mr. Pruitt takes issue with the Indiana Supreme Court's finding that he could "fill out applications for employment" and had "the capacity, if not the will at times, to support himself." (Doc. No. 31 at 28). Mr. Pruitt spends much of his traverse brief arguing that the ability to fill out employment applications and the ability to earn a living simply are not relevant and so are improper considerations for assessing intellectual functioning. (*See* Doc. No. 31 at 37-41). That is an argument for misapplication of the law, which, as already discussed, is unavailing. Mr. Pruitt's complaint that the ability to fill out job applications and

earn a living are improper measures of intellectual functioning doesn't amount to a true complaint that the state court made an unreasonable determination of the facts. *See* 28 U.S.C. § 2254(d)(2).

To the extent Mr. Pruitt actually challenges the determination about his abilities to fill out employment applications and to support himself, ample evidence in the record supports these determinations and such an argument must fail. (*See, e.g.*, Mental Retardation H'ng State's Exh. 2, Flying J Application for Employment; State's Exh. 3, Gibson-Lewis Application for Employment; State's Exh. 26, Tom R. Pruitt 1999 IT-40EZ tax form).

## B. Claim II: Ineffective Assistance Of Counsel Re: Presentation Of Mental Retardation Evidence

Mr. Pruitt brings several ineffective assistance of counsel claims in his petition. He presents four discrete ineffective assistance arguments within Claim II of his petition.

Under <u>Strickland v. Washington</u>, 466 U.S. 668, 687 (1984), Mr. Pruitt must establish (1) that counsel's performance was deficient; and (2) that the deficient performance prejudiced his defense. To satisfy the first prong of ineffectiveness, Mr. Pruitt "must show that counsel's representation fell below an objective standard of reasonableness." <u>Id.</u> at 688. To satisfy the prejudice prong, he "must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable

probability is a probability sufficient to undermine confidence in the outcome." Id. at 694.

A court's review of counsel's performance must be "highly deferential" and Mr. Pruitt must "overcome the presumption that, under the circumstances, the challenged action might be considered sound trial strategy." Id. at 689 (internal citation and quotation marks omitted). Federal review of a state court decision is "doubly deferential": the court must "take a highly deferential look at counsel's performance . . . through the deferential lens of § 2254(d)." Cullen v. Pinholster, ---U.S.----, 131 S. Ct. 1388 (2011) (internal citations and quotation marks omitted). "[A] lawyer's decision to call or not to call a witness is a strategic decision generally not subject to review." Valenzuela v. United States, 261 F.3d 694, 699-700 (7th Cir. 2001) (internal citation and quotation marks omitted). *See also* United States v. Balzano, 916 F.2d 1273, 1294 (7th Cir. 1990) ("The Constitution does not oblige counsel to present each and every witness that is suggested to him. In fact, such tactics would be considered dilatory unless the attorney and the court believe the witness will add competent, admissible and non-cumulative testimony to the trial record.").

*1. Failure To Call Dr. Olvera*

First, Mr. Pruitt contends that his trial counsel's decision not to call Dr. Olvera as a witness at the pretrial mental retardation hearing to testify about the possible impact of the antipsychotic drug Trilafon and the Flynn Effect constitutes ineffective assistance of counsel. Dr. Olvera administered the WAIS-III exam in April 2002 and determined that Mr. Pruitt achieved a full-scale score of 76. Mr. Pruitt argues that Dr. Olvera could have explained how the administration of the anti-psychotic drug, Trilafon, artificially elevated Mr. Pruitt's score to a 76. Mr. Pruitt also contends that Dr. Olvera could have testified about the "Flynn Effect" which also could have artificially elevated Mr. Pruitt's score to a 76.[5]

On post-conviction review, the Indiana Supreme Court found that Mr. Pruitt's counsel presented expert testimony at the pretrial hearing on both Trilafon and the Flynn Effect in connection with Mr. Pruitt's IQ score of 76. Pruitt II, 903 N.E.2d at 917. At Mr. Pruitt's pretrial hearing on mental retardation, Dr. Golden "testified that if 'given the appropriate antipsychotic drug,' the IQ scores of those with psychiatric disorders 'may go up significantly because of improvements in attention and focusing.'" Id. (quoting Trial Tr. at 1500). The court further noted that "Dr. Golden then administered the Stanford-Binet IQ test to Pruitt while he was not on any antipsychotic medication. Pruitt scored an overall IQ of 65, from

---

[5] As already explained, the Flynn Effect is the steady rising of IQ scores over time. To counter this effect, IQ scores are "renormed" (made more difficult) every 10-15 years by resetting the mean score to 100 to account for previous gains in IQ scores. (PC Tr. at 41-42, 55).

which Dr. Golden concluded that Pruitt was mentally retarded." Id. The state argues that Dr. Golden's testimony about the effects of antipsychotic medication at Mr. Pruitt's pretrial mental retardation hearing was more favorable than offering testimony from Dr. Olvera, an expert who earlier had determined that Mr. Pruitt is not mentally retarded based on Mr. Pruitt's WAIS-III scores of 76.

The Indiana Supreme Court also found that trial counsel presented some evidence of the Flynn Effect's artificial inflation of test scores during the pre-trial hearing:

> During the pre-trial mental retardation hearing, defense counsel cross-examined State expert Dr. Schmedlen regarding Pruitt's WAIS-III IQ score of 76 and the impact of the Flynn Effect on this score. Dr. Schmedlen indicated that the WAIS–III has a "standard error of measure" of five points, meaning that Pruitt scored in the range of 71 to 81. (Trial Tr. 617–18.) He concluded from this analysis that Pruitt was not an individual with mental retardation. Id. at 618–19. Later in the cross-examination, defense counsel asked, "Assuming that the result of Dr. Olvera's WAIS–III is artificially high such that the real score is within two standard deviations of 70, would that affect your opinion as to Mr. Pruitt's intellectual functioning?" Id. at 678. Dr. Schmedlen responded, "I think it might, yeah." Id. at 679. Defense counsel did not ask any further questions about the Flynn Effect.

Pruitt II, 903 N.E.2d at 911. The supreme court concluded that "trial counsel's performance was not deficient in his presentation of evidence regarding the impact of the Flynn Effect on Pruitt's WAIS-III IQ score." Id.

The state also points out that some of Mr. Pruitt's own post-conviction witnesses acknowledged disagreement in the psychological community concerning

acceptance of the theory and that some literature suggests a reversal of the Flynn Effect in certain areas of the world. (*See* PC App. at 674-75).

A federal court may grant habeas relief if the state identifies the correct legal principle from the U.S. Supreme Court but unreasonably applies that principle to the facts of the petitioner's case. See 28 U.S.C. § 2254(d)(1). The Indiana Supreme Court correctly reviewed Mr. Pruitt's claim under the Strickland standard, reasonably applied Strickland to his allegations, and rejected those allegations. The supreme court reasonably concluded that trial counsel's decision not to call Dr. Olvera was a reasonable strategic decision in light of potential pitfalls in calling him, most prominently that Dr. Olvera had concluded that Mr. Pruitt is not mentally retarded. Furthermore, any testimony by Dr. Olvera on the effect of Trilafon and the Flynn Effect on Mr. Pruitt's April 2002 IQ would have been cumulative to testimony already elicited from other witnesses.

Finally, Mr. Pruitt's contention in his traverse brief that the supreme court mischaracterized Dr. Olvera's post-conviction testimony about the acceptance, or lack thereof, of the Flynn Effect is simply incorrect. Dr. Olvera testified that acceptance of the Flynn Effect, especially in forensic settings, but also in clinical settings is "contentious." (PC Tr. at 58). Dr. Olvera also acknowledged that recent research suggests that the Flynn Effect is actually reversing itself in developed countries and that the WAIS manual does not instruct examiners to subtract points from an IQ score to account for the Flynn Effect. (PC Tr. at 59).

## 2. Mr. Pruitt's Return To Special Education Courses

Mr. Pruitt next argues that his trial counsel were constitutionally ineffective in presenting evidence of mental retardation by not showing that Mr. Pruitt was returned to special education courses in the eighth grade. The state contends that this argument is procedurally defaulted. Mr. Pruitt argues that the special education claim isn't defaulted, even though the Indiana Supreme Court determined it was defaulted on post-conviction review. The court found:

> In his petition for post-conviction relief, Pruitt did not raise the claim that trial counsel failed to investigate and discover the fact that he was referred to special education in eighth grade. The post-conviction court (PC court) therefore did not discuss this claim in its order, and it is not available for this Court's review. *See* Allen [v. State], 749 N.E.2d [1158], 1171 [(Ind. 2001)] ("Issues not raised in the petition for post-conviction relief may not be raised for the first time on post-conviction appeal.") (citations omitted).

Pruitt II, 903 N.E.2d at 906.

Mr. Pruitt did raise the issue of counsel's presentation of his academic history in his post-conviction petition, albeit in a much more generic fashion than he now presents the issue. Mr. Pruitt alleged in his amended state court petition that "Counsel failed to present complete and accurate evidence regarding Pruitt's educational background, and the limited services available to him." (PC App. at 127, Amended Petition for Post-Conviction Relief, filed Dec. 27, 2006). Judge Humphrey addressed the claim in his post-conviction opinion: "Pruitt alleges trial counsel to have been ineffective for failing to present complete and accurate

evidence regarding Pruitt's educational background, and the limited services available to him," and Judge Humphrey found "no evidence of Pruitt's educational background presented at post-conviction that would have had, if it [had] been offered at trial, any effect on his convictions and sentences." (PC App. at 679).

Mr. Pruitt raised the claim again in his post-conviction appeal to the Indiana Supreme Court, phrasing the claim as: "*Failure to Present Complete And Accurate Evidence Regarding Pruitt's Educational Background, And The Limited Services Available To Him.*" (Doc. No. 26-11 at 40). Within the text under this subheading in his appellate brief, Mr. Pruitt further explained that "[c]ounsel did not present this evidence because he was not aware of Pruitt's return to special education classes." (Id. at 41).

Under the doctrine of procedural default, "a federal court will not review the merits of claims, including constitutional claims, that a state court declined to hear because the prisoner failed to abide by a state procedural rule." Martinez v. Ryan, ---U.S.---, 132 S. Ct. 1309, 1316 (2012). A state court's invocation of a procedural rule to deny a claim precludes federal review if the procedural rule is a nonfederal ground "adequate to support the judgment" and the rule is "firmly established and consistently followed." Id. Federal courts generally won't consider whether the state court properly applied its default rule to the petitioner's facts. See Barksdale v. Lane, 957 F.2d 379, 383-384 (7th Cir. 1992) ("[A] federal court sitting in habeas corpus is required to respect a state court's finding of waiver or

procedural default under state law. Federal courts do not sit to correct errors made by state courts in the interpretation and application of state law.") (internal citations and quotation marks omitted). Application of the procedural default doctrine is premised on the prisoner actually having violated the applicable state procedural rule. *See* Coleman v. Thompson, 501 U.S. 722, 750 (1991).

Mr. Pruitt doesn't argue that Indiana's requirement that petitioners present and exhaust claims in state post-conviction petitions isn't an adequate and independent ground. Rather, he argues that the Indiana Supreme Court didn't apply the rule properly in his case, maintaining that the allegation in his post-conviction petition that "[c]ounsel failed to present complete and accurate evidence regarding Pruitt's educational background, and the limited services available to him" fairly articulates and encompasses the more specific claim regarding a return to special education classes in the eighth grade that Mr. Pruitt raised on appeal to the Indiana Supreme Court.

Mr. Pruitt hasn't demonstrated that the Indiana Supreme Court's determination that this claim was procedurally defaulted is inconsistent with Indiana law. Section 8 of the Indiana Rules of Post-Conviction Remedies provides: "All grounds for relief available to a petitioner under this rule must be raised in his original petition." The supreme court's determination that Mr. Pruitt's original post-conviction petition did not adequately raise a Sixth Amendment claim concerning his return to special education classes wasn't inconsistent with

Indiana law that petitioners assert all grounds for relief. Further, it isn't within this court's purview to reinterpret Indiana procedural law. *See* <u>Barksdale v. Lane</u>, 957 F.2d at 383-384. Mr. Pruitt's post-conviction petition generically asserted a claim that counsel did not adequately present evidence related his educational background and the limited services available to him. Mr. Pruitt refined that claim on appeal to the Indiana Supreme Court with a more specific claim—that counsel erred by not presenting evidence that he returned to special education classes in eighth grade. The Indiana Supreme Court's determination that Mr. Pruitt's ineffective assistance of counsel claim relating to his return to special education was procedurally defaulted for failure to exhaust constitutes an independent and adequate state law basis for disposing of the claim, and this court is procedurally barred from considering the claim on habeas review.

### 3. Evidence Of Educational Environment And Experiences

Mr. Pruitt claims that his trial counsel were ineffective in their presentation of mental retardation evidence because they didn't explain Mr. Pruitt's educational environment and experiences well enough. Mr. Pruitt argues that trial counsel erred by not calling Dr. Dare as a witness to testify about "the state of the special education system at the time Pruitt was in school." (Doc. No. 14 at 23). During post-conviction proceedings, Dr. Dare testified that before the enactment of federal legislation addressing special education, services offered by Indiana schools varied

greatly, and a rural school like the one Mr. Pruitt attended was the least likely to provide extensive special education services.

Judge Humphrey found on post-conviction review "no evidence of Pruitt's educational background presented at post-conviction that would have had, if it [had] been offered at trial, any effect on his convictions and sentences." (PC App. 679). The Indiana Supreme Court affirmed Judge Humphrey's conclusion:

> The PC court made certain findings of fact from which it reached its conclusion. Regarding Pruitt's educational background and the limited services available to him, the PC court found (1) that trial counsel had presented the fact that in elementary school, Pruitt was retained for two grades, and he was in special education in 1971 and 1972; (2) that trial counsel also had presented testimony from Pruitt's junior high teacher Rex Nichols that Pruitt did not seem interested in school and that with full effort he was a C student; and (3) that Randy Tutterow, Pruitt's fifth and sixth grade social studies teacher, had testified that he thought Pruitt was a C and D student, and that his lack of interest had a negative effect on his grades.

> There is evidence in the record to support the PC court's findings of fact. Defense counsel, in his direct examination of Dr. Hudson, presented multiple facts from Pruitt's educational background, including

>> he never got beyond ... 8th grade of school ... he never obtained a GED, that for better than one year, in a very small elementary school in the '70s, was placed in a special education program, evidence that he had substantial problems in simple mathematics and reading, grades one through three ... was retained twice before the eighth grade, that on two occasions were socially promoted ... in fact, been retained four years in the first eight grades of school, absent social promotion, would have been 16 and a half before ... 7th grade.

>> (Trial Tr. 1282–83.)

39

Dr. Hudson also testified that his conclusions about whether Pruitt was an individual with mental retardation were based on "educational records of Mr. Pruitt's throughout grade school ... [and] his grades for all the years that he was in school." [Trial Tr.] at 1209. Our review of the PC court's findings does not lead us to an opposite conclusion than that reached by the PC court. We affirm the PC court's conclusion that trial counsels' performance was not deficient in this regard.

Pruitt II, 903 N.E.2d at 908-909.

The Indiana Supreme Court's determination that counsel's performance wasn't deficient is not an unreasonable determination. Mr. Pruitt's counsel presented evidence of Mr. Pruitt's lackluster academic career. Additional evidence from Dr. Dare further explaining Mr. Pruitt's academic performance would have been cumulative.

The record is rife with examples of Mr. Pruitt's shortcomings as a student. as the Indiana Supreme Court pointed out, Dr. Hudson testified that Mr. Pruitt "'never got beyond . . . 8th grade of school . . . he never obtained a GED, that for better than one year, in a very small elementary school in the '70s, was placed in a special education program, evidence that he had substantial problems in simple mathematics and reading, grades one through three . . . was retained twice before the eighth grade, that on two occasions were socially promoted . . . in fact, been retained four years in the first eight grades of school, absent social promotion, would have been 16 and a half before . . . 7th grade.'" Pruitt II, 903 N.E.2d at 909 (quoting Trial Tr. at 1282-1283). The Indiana Supreme Court's holding is not an unreasonable application of Strickland.

*4. Explanation Of Employment History*

Mr. Pruitt also claims that his trial counsel were ineffective in their mental retardation presentation by insufficiently explaining how a mentally retarded person could have an extensive employment history like that of Mr. Pruitt. Mr. Pruitt argues that his trial counsel should have offered testimony like what Dr. Olvera and Marie Dausch offered at the post-conviction hearing, explaining that mentally retarded individuals can fill out job applications, maintain successful employment, and drive vehicles. Mr. Pruitt argues that the absence of this additional evidence at Mr. Pruitt's pretrial hearing was particularly harmful because Judge Humphrey, when denying Mr. Pruitt's motion for determination of mental retardation, cited Mr. Pruitt's ability to maintain employment, fill out job applications, earn money, and obtain a CDL as persuasive evidence that Mr. Pruitt isn't mentally retarded within Indiana's statutory definition.

The Indiana Supreme Court concluded that "the record is replete with examples of trial counsel exploring how Pruitt's work history was possible for a person with substantial intellectual deficits." Pruitt II, 903 N.E.2d at 910. The court found that trial counsel presented extensive evidence on the issue at trial:

> [I]n point of fact, trial counsel did explain how Pruitt's work history was possible for a person with substantial intellectual deficits. In his cross-examination of State's witness, Dr. Schmedlen, trial counsel asked, "And now, is it a fair characterization ... that actually having a job is not necessarily indicative of adaptive behavior?" (Trial Tr. 690.) Dr. Schmedlen replied in the affirmative. Trial counsel also

explored the fact that Pruitt was able to earn a commercial driver's license. He asked Dr. Hudson on direct, "So merely acquiring a CDL, would that tell you anything about a person's mental retardation or lack thereof?" <u>Id.</u> at 1262. Dr. Hudson replied, "No, no, no, no." <u>Id.</u> Trial counsel delved further into this topic by asking Dr. Hudson, "Is merely being employed enough to satisfy the, I guess lack of a deficit in the work adaptive behavior?" <u>Id.</u> at 1264. Dr. Hudson responded in the negative, and defense counsel asked him to elaborate.

<u>Id.</u> at 909. The court pointed out that trial counsel elicited testimony from Dr. Hudson that Mr. Pruitt was able to acquire his journeyman's carpenter card and maintain employment with Pete Carlino only because Mr. Pruitt's father was a skilled carpenter and Mr. Carlino's trusted employee. <u>Id.</u> Dr. Hudson further explained that Mr. Pruitt could only work only under the close supervision of his father, and that he otherwise lacked carpentry skills. <u>Id.</u>

The supreme court's determination that trial counsel were not deficient with respect to their presentation of evidence about Mr. Pruitt's work history was not unreasonable. Mr. Pruitt's counsel elicited testimony about how the ability to hold a job and drive a vehicle is not conclusive evidence to assess whether an individual is mentally retarded. The additional testimony Mr. Pruitt argues should have been offered would have been cumulative of evidence already in the record. That the evidence didn't persuade the trial judge doesn't mean counsel didn't do as much as the constitution demands. Trial counsel's efforts were not deficient.

## C. Claim III: Exclusion Of Witness During Guilt Phase

In preparation for trial, Mr. Pruitt's trial counsel contacted the hospital at which Deputy Starnes was treated to obtain Deputy Starnes's medical records. Trial counsel didn't receive all the medical documents, including information about a hole in Deputy Starnes's esophagus, until the last day of the statute of limitations for a medical malpractice claim in connection with Deputy Starnes's treatment.

Michelle Calderone, the hospital's attorney, testified during the penalty phase that the hospital initially produced 1,147 pages of records to Mr. Pruitt's trial counsel in November 2002. (Trial Tr. at 4986). In response to a request for operative records and backup data from Mr. Pruitt's counsel, the hospital sent Mr. Pruitt's counsel 55 more pages on July 9, 2003, one day before a medical malpractice claim would lapse and about three months before the start of Mr. Pruitt's trial. (Trial Tr. at 4987-4988). Before Mr. Pruitt's trial, the state moved in limine to preclude Mr. Pruitt from calling Ms. Calderone as witness during the guilt phase of his trial. Judge Humphrey granted that motion. Mr. Pruitt contends that Ms. Calderone's testimony about a possible "cover-up" might have allowed the jury to convict him of aggravated battery instead of murder, and would have revealed the bias of the three doctors' testimony about their treatment of Deputy Starnes.

Mr. Pruitt argues that Judge Humphrey's ruling that Mr. Pruitt couldn't call Ms. Calderone to testify during the guilt phase of his trial deprived him of his right to present a full defense under the Sixth and Fourteenth Amendments. He contends Ms. Calderone's testimony would have supported a finding of aggravated battery rather than murder. He contends Ms. Calderone's testimony about the transmission of Deputy Starnes's records was relevant during the guilt phase of Mr. Pruitt's trial to demonstrate bias of other hospital witnesses who testified that the hospital did everything in its power to save Deputy Starnes, thereby raising an inference of malpractice.

On direct appeal, the Indiana Supreme Court concluded that "the attorney's testimony was immaterial as to guilt," so Judge Humphrey didn't err in granting the state's motion in limine as to the guilt phase. Pruitt I, 834 N.E.2d at 120. The court noted that "[t]here was no claim that Starnes's treatment constituted an intervening cause. The medical records were available to Pruitt. His only complaint is to the circumstances of the apparent delay in providing them." Id. Because Mr. Pruitt "did not claim that the ineffectiveness of the doctor's care constituted an intervening cause precluding his criminal liability for murder," the supreme court determined that Ms. Calderone's testimony about the release of records was irrelevant and so inadmissible under the Indiana Rules of Evidence. Id.

"On a petition for writ of habeas corpus, a federal court will not review evidentiary questions unless there is a resultant denial of fundamental fairness

or the denial of a specific constitutional right." <u>Stomner v. Kolb</u>, 903 F.2d 1123, 1128 (7th Cir. 1990) (internal citation and quotation marks omitted). State and federal rulemakers possess "broad latitude under the Constitution to establish rules excluding evidence from criminal trials." <u>United States v. Scheffer</u>, 523 U.S. 303, 308 (1998) (holding that the proscription against the introduction of polygraph examination results contained in Military Rule of Evidence 707 did not violate Due Process Clause). This latitude has limits: "[w]hether rooted directly in the Due Process Clause of the Fourteenth Amendment . . . or in the Compulsory Process or Confrontation clauses of the Sixth Amendment . . ., the Constitution guarantees criminal defendants a meaningful opportunity to present a complete defense." <u>Crane v. Kentucky</u>, 476 U.S. 683, 690 (1986) (internal citations and quotation marks omitted). "The right is abridged by evidence rules that 'infring[e] upon a weighty interest of the accused' and are 'arbitrary' or 'disproportionate to the purposes they are designed to serve.'" <u>Holmes v. South Carolina</u>, 547 U.S. 319, 324 (2006) (<i>quoting</i> <u>United States v. Scheffer</u>, 523 U.S. at 308) (bracket in original).

In <u>Crane v. Kentucky</u>, the state trial court denied a sixteen-year-old defendant the opportunity to offer evidence about the conditions under which the police obtained a confession from him. 476 U.S. at 685-686. Considering the claim that this evidentiary bar was unconstitutional, the Supreme Court noted that a defendant's opportunity to be heard "would be an empty one if the State were

permitted to exclude competent, reliable evidence bearing on the credibility of a confession when such evidence is central to the defendant's claim of innocence." Id. at 690. The Court held that the excluded testimony about the circumstances of the confession was central to the defendant's defense. Id. at 691. In Holmes v. South Carolina, the Court held that a criminal defendant's constitutional rights were violated by South Carolina law that precluded defendants from introducing evidence of third-party guilt if the prosecution has introduced forensic evidence that, if believed, strongly supports a guilty verdict. 547 U.S. at 331.

In Washington v. Texas, 388 U.S. 14 (1967), petitioner Washington was convicted of murder. Both Washington and a man named Charles Fuller were present when the fatal gunshot was fired. Id. at 15-16. Washington testified at his trial that he didn't shoot the victim, and had in fact been running back to his vehicle when he heard a shot ring out, presumably fired by Fuller. Id. at 16. Fuller wasn't allowed to corroborate this version of events at trial because he had been convicted of the same murder and Texas evidentiary rules precluded persons charged as accomplices in the same crime from testifying on one another's behalf. Id. at 16-17. The United States Supreme Court found the Texas rule that prohibited the accomplice from testifying for his co-accomplice, but not for the prosecution, to be "absurd" and "arbitrary," noting that "[t]he Framers of the Constitution did not intend to commit the futile act of giving to a defendant the

right to secure the attendance of witnesses whose testimony he had no right to use." Id. at 23.

Yet the Court has made clear that Crane, Holmes, Washington, and related cases did "nothing to undermine the principle that the introduction of relevant evidence can be limited by the state for a 'valid' reason." Montana v. Egelhoff, 518 U.S. 37, 53 (1996). In Holmes, the Court explained that "we have stated that the Constitution permits judges 'to exclude evidence that is repetitive . . ., only marginally relevant' or poses an undue risk of harassment, prejudice, [or] confusion of the issues.'" Holmes v. South Carolina, 547 U.S. at 326-327 (*quoting* Crane v. Kentucky, 476 U.S. at 689-690 (ellipsis and brackets in original)).

A violation of the fundamental right to present a defense is not established merely by showing that a trial court excluded evidence relevant to a defense. A petitioner must show that the exclusion of evidence "significantly undermined fundamental elements of the accused's defense." United States v. Scheffer, 523 U.S. at 315. Put another way, the exclusion of evidence is unconstitutionally arbitrary or disproportionate "only where it infringed upon a weighty interest of the accused." Id. at 308 (*citing* Rock v. Arkansas, 483 U.S. 44, 58 (1987)); *see also* Hood v. Uchtman, 414 F.3d 736, 738 (7th Cir. 2005) (holding that fundamental right to present a defense was not violated where trial court found the evidence at issue to be "speculative, remote, and therefore irrelevant"). Even if exclusion of evidence is erroneous under state law, the constitutional right to present a

defense isn't abridged unless the excluded evidence was so material that it deprived the defendant of a fair trial.

The Indiana Supreme Court concluded that Ms. Calderone's "testimony was immaterial as to guilt" because "[t]here was no claim that Starnes's treatment constituted an intervening cause. The medical records were available to Pruitt. His only complaint is to the circumstances of the apparent delay in providing them." Pruitt I, 834 N.E.2d at 120. That conclusion is not an unreasonable application of federal law. Ms. Calderone's testimony was irrelevant to the issue before the jury at the guilt phase of Mr. Pruitt's trial. Mr. Pruitt didn't argue that the care Deputy Starnes received at the hospital constituted an intervening cause, precluding criminal liability for murder.

Mr. Pruitt remains unable to articulate how testimony about the hospital's document retention policy was relevant to the issue of whether Mr. Pruitt committed the charged crimes. Testimony about the hospital's document retention policy was not so material to Mr. Pruitt's defense for the exclusion of the evidence to have deprived him of a fair trial. The state of Indiana has a valid reason to limit evidence on the basis of relevance, and this limitation did not violate Mr. Pruitt's constitutional rights. *See* Montana v. Egelhoff, 518 U.S. at 53.

*D. Claim V: Clemency Instruction*

Indiana Code § 35-50-2-9(d) requires the trial court to instruct the jury

before the sentencing on "the availability of . . . clemency." Over the objection of

Mr. Pruitt's trial counsel (Trial Tr. at 6262), Judge Humphrey gave this instruction

to the jury:

> The Governor of Indiana has the power under the Indiana
> Constitution to grant a reprieve, commutation or pardon to a person
> convicted and sentenced for murder. A pardon completely eliminates
> a conviction and sentence, a commutation reduces the sentence, for
> example, by changing a death sentence to one for life without parole
> or for a term of imprisonment. A reprieve is a temporary
> postponement of the execution of a sentence. The Indiana
> Constitution leaves it entirely up to the discretion of the Governor
> when and how to use this power.

(Trial Tr. at 6383-6384). Mr. Pruitt argues that the clemency instruction violated

the Eighth Amendment under Caldwell v. Mississippi, 472 U.S. 320 (1985), by

reducing the jury's sense of responsibility for the punishment of death. He argues

that the instruction diminished the jurors' sense of responsibility "by alluding that

the Governor would intervene in Petitioner's case" to change the penalty from

death to life without parole or a term of imprisonment. (Doc. No. 31 at 62).

The Indiana Supreme Court rejected this claim on direct appeal. Pruitt I,

834 N.E.2d at 118-119. The court cited California v. Ramos, 463 U.S. 992 (1983),

and Caldwell v. Mississippi, 472 U.S. 320 (1985), to reach its conclusion that no

constitutional violation occurred because the clemency instruction given to Mr.

Pruitt's jury was an accurate representation of the law. <u>Pruitt I</u>, 843 N.E.2d at 119.

Death-sentencing jurors cannot be led to believe responsibility for the offender's death lies elsewhere. <u>Caldwell v. Mississippi</u>, 472 U.S. at 328-329. But jurors may be informed of the governor's clemency powers. <u>California v. Ramos</u>, 463 U.S. at 1010.

Mr. Pruitt relies heavily on <u>Caldwell v. Mississippi</u>, in which the defendant was convicted of murder by a jury in a Mississippi state court. During his closing argument at the penalty phase, the prosecutor said in reference to defense counsel's earlier statements: "Now, [defense counsel] would have you believe that you're going to kill this man and they know—they know that your decision is not the final decision. My God, how unfair can you be? Your job is reviewable." <u>Caldwell v. Mississippi</u>, 472 U.S. at 325. The prosecutor went on to stress to the jury that "the decision you render is automatically reviewable by the Supreme Court." <u>Id.</u> at 325-326.

The Court held that the prosecutor violated the defendant's Eighth Amendment rights because "the sentencing jury [was] led to believe that responsibility for determining the appropriateness of a death sentence rests not with the jury but with the appellate court which later reviews the case." <u>Id.</u> at 323. The Court emphasized that appellate review has significant limitations that were not explained to the jury. <u>Id.</u> at 330-331. The touchstone of the opinion, as well

as Justice O'Connor's concurrence providing the fifth vote, is the principle that the jury must understand that the imposition of the death penalty is in its hands. *See* id. at 342 (O'Connor, J., concurring). The Court concluded that "it is constitutionally impermissible to rest a death sentence on a determination made by a sentencer who has been led to believe that the responsibility for determining the appropriateness of the defendant's death rests elsewhere." Id. at 328-329. To establish a Caldwell violation, then, "'a defendant necessarily must show that the remarks to the jury improperly described the role assigned to the jury by local law.'" Romano v. Oklahoma, 512 U.S. 1, 9 (1994) (*quoting* Dugger v. Adams, 489 U.S. 401, 407 (1989)).

In California v. Ramos, the defendant challenged his death sentence, claiming that the trial judge violated his Eighth and Fourteenth Amendment rights by instructing the jury at the penalty hearing that the governor had the power to pardon or commute a sentence. The judge explained that the governor "may . . . commute or modify a sentence of life imprisonment without possibility of parole to a lesser sentence that would include the possibility of parole." California v. Ramos, 463 U.S. at 995-996. Rejecting the defendant's challenge, the Supreme Court observed that the instruction was an accurate statement of California law. Id. at 1009. The Supreme Court held that no federal constitutional impediment exists to providing a jury "with an accurate statement of a potential sentencing alternative." Id.

Reading Ramos and Caldwell together, it is impermissible for either a prosecutor or a court to mislead a jury about its responsibility for deciding whether a defendant will be executed by giving the jury inaccurate information about the jury's role in the death determination process or the role of an appellate court or governor. So long as what the jury is told is accurate, the Eighth Amendment isn't implicated.

The instruction to which Mr. Pruitt objects is an accurate statement of Indiana law. Mr. Pruitt doesn't argue that the instruction misled the jury about Indiana clemency law, nor could he. The instruction accurately represents gubernatorial clemency power in Indiana. Supreme Court precedent doesn't preclude informing the jury of post-trial proceedings, it only precludes doing so in a misleading fashion that undercuts the jury's sense of responsibility. *See* Caldwell v. Mississippi, 472 U.S. at 328-329. The Indiana Supreme Court's determination that the instruction didn't violate the Eighth Amendment is not an unreasonable application of federal law.

Mr. Pruitt seeks to distinguish Ramos on the ground that Indiana, unlike California, is a "weighing state" that doesn't allow consideration of non-statutory circumstances, such as defendant's future dangerousness, in a sentencing decision. Mr. Pruitt seems to argue in his traverse brief (for the first time) that the clemency instruction invites or asks jurors to consider future dangerousness in its weighing of aggravating factors. This line of argument involving future

dangerousness arguably is waived. *See* <u>Pole v. Randolph</u>, 570 F.3d at 934; *see also* <u>Whitehead v. Cowan</u>, 263 F.3d at 730 n.5.

Assuming the future dangerousness argument is not waived, it fails on the merits. Mr. Pruitt appears to conflate two different constitutional arguments and insert a leap of logic between the two. The first constitutional argument is that discussed above addressing <u>Caldwell</u>'s mandate that attorneys and courts not mislead the jury about its role in the sentencing process. As already discussed, the Indiana Supreme Court addressed this argument on direct review and reasonably concluded no constitutional error existed. Mr. Pruitt tries to fit his second argument into his <u>Caldwell</u> claim: that consideration of non-statutory aggravating circumstances (such as future dangerousness) in a "weighing" state (like Indiana) violates the Constitution. The assumption inherent in this argument is that Judge Humphrey's clemency instruction amounts to an instruction to the jury to consider Mr. Pruitt's "future dangerousness" (a non-statutory aggravator) when deciding Mr. Pruitt's punishment. Mr. Pruitt cites <u>California v. Ramos</u> in support of this assumption. Upholding the clemency instruction at issue in <u>Ramos</u>, the Supreme Court noted the following:

> By bringing to the jury's attention the possibility that the defendant may be returned to society, the Briggs Instruction invites the jury to assess whether the defendant is someone whose probable future behavior makes it undesireable that he be permitted to return to society. Like the challenged factor in Texas' statutory scheme, then, the Briggs Instruction focuses the jury on the defendant's probable future dangerousness.

California v. Ramos, 463 U.S. at 1003.

That observation is not the Court's holding in Ramos, and Judge Humphrey never instructed the jury that Mr. Pruitt's "future dangerousness" was an aggravating circumstance that the jury was to consider when determining Mr. Pruitt's punishment. The opposite is true: Judge Humphrey made clear that the only aggravating circumstance the jury was to consider was that charged by the state—that Deputy Starnes was a peace officer killed during the course of his duties: "You are not permitted to consider any circumstances as weighing in favor of the sentence of death or life imprisonment without parole, other than the aggravating circumstance specifically charged by the state in the charging information." (Trial Tr. at 6374-6375). Judge Humphrey expounded on this point later in during his charge to the jury: "Lastly, unlike aggravating circumstances, there are no limits on what acts any of you may find as mitigating." (Trial Tr. at 6380). It is a long leap to conclude that the pardon instruction can be equated to an instruction to the jury to consider a non-statutory aggravating circumstance. This record doesn't support such a leap.

*E. Claim VI: Ineffective Assistance Of*
*Counsel: Presentation Of Mitigation Evidence*

Mr. Pruitt raises additional ineffective assistance of counsel arguments in Claim VI, which consists of two sub-claims: (1) Mr. Pruitt says his trial counsel were constitutionally deficient because they didn't adequately present evidence of

Mr. Pruitt's alleged mental illness—paranoid schizophrenia—during the penalty phase of his trial; and (2) Mr. Pruitt contends that his trial counsel were defective for failing to present a comprehensive, written social history that thoroughly explained his background, leaving both experts and the jury unable to grasp fully Mr. Pruitt's mental illness. The Indiana Supreme Court rejected both arguments on post-conviction review.

### 1. Presentation Of Paranoid Schizophrenia Evidence

Mr. Pruitt complains that his trial counsel didn't adequately present evidence during the penalty phase of trial that he suffered from paranoid schizophrenia. Instead, trial counsel presented evidence that Mr. Pruitt suffered from "schizotypal personality disorder," a lesser form of schizophrenia. Mr. Pruitt contends that trial counsel should have pursued a stronger mental illness mitigation defense based on additional expert testimony. Mr. Pruitt faults trial counsel's failure to seek out an expert in schizophrenia, choosing instead to rely upon Dr. Golden to testify about Mr. Pruitt's mental illness. Mr. Pruitt also faults trial counsel for not asking Dr. Golden whether he believed Mr. Pruitt met the criteria for two statutory mitigating factors related to mental illness. *See* IND. CODE §§ 35-50-2-9(c)(2) and 35-50-2-9(c)(6).

Mr. Pruitt's expert, Dr. Golden, testified during the penalty phase that the federal Bureau of Prisons had diagnosed Mr. Pruitt with "schizotypal personality

disorder . . . an Axis 2 mental illness" in 1996 while he was imprisoned for another crime. (Trial Tr. at 6043). Dr. Golden testified that "'psychotic episodes should be the exception rather than the rule' for those with this disorder, and that if these episodes "were the main symptoms, then you would be diagnosing him as schizophrenic or something similar to that." Pruitt II, 903 N.E.2d at 919-20 (*quoting* Trial Tr. at 6045-46). The Indiana supreme court further summarized Dr. Golden's trial testimony:

> Later in the trial, Dr. Golden testified on direct examination that about two months after Pruitt was arrested for allegedly killing Officer Starnes, an Indiana DOC psychologist diagnosed Pruitt as suffering from "schizophrenia, chronic undifferentiated type compensated residual." Id. at 6053. Dr. Golden explained that this diagnosis means that the psychologist "thinks that at one time that he [Pruitt] was actually schizophrenic . . . but that right now most of those serious symptoms are not showing and . . . he's somewhere now in between a personality disorder and the Axis 1 schizophrenia." Id. at 6054. In other words, "[h]e's not suggesting he's actively schizophrenic, but he is expressing his belief that he is capable of easily becoming schizophrenic at some time in the future." Id. at 6055. Dr. Golden concluded that Pruitt's mental illness is "in the schizophrenia spectrum of disorders"; however, his opinion is that the illness is "not severe enough to be called schizophrenic, so I go with the schizotypal or the schizoid diagnosis." Id. at 6057. Dr. Golden then explained in detail the symptoms of schizoid personality disorder and its debilitating effects on the patient. *See* id. at 6058–62.

Id. at 920.

At the post-conviction hearing, Mr. Pruitt offered the testimony of Drs. Philip Coons, David Price, and James Ballenger. All three experts testified that Mr. Pruitt actually suffered from Axis I paranoid schizophrenia, a condition more severe than schizotypal personality disorder. At the post-conviction hearing, Dr. Coons

56

testified that "all of the symptoms with schizotypal personality disorder are included under schizophrenia." (PC Tr. at 458). Dr. Coons concluded that Mr. Pruitt suffered from Axis I schizophrenia based upon a "three-hour evaluation of Pruitt, interviews with family members, the reports written by other petitioner's experts obtained for post-conviction, and a review of Pruitt's social history." Pruitt II, 903 N.E.2d at 920. Dr. Price diagnosed Mr. Pruitt with both schizophrenia and schizotypal personality disorder. (PC Tr. at 705 and 707). Dr. Price diagnosed Mr. Pruitt with schizophrenia and opined that Dr. Golden described the same behaviors Dr. Ballenger used to diagnosis Mr. Pruitt with Axis I schizophrenia but that Dr. Golden "slightly used a different terminology," noting that Dr. Golden's diagnosis, "a decompensated psychotic state of somebody with a schizotypal personality . . . is only a hair different from what I would have said." (PC Tr. at 589).

Judge Humphrey said that he did "not find the expert testimony offered at post-conviction more credible or more deserving of weight than the testimony offered on mental health issues at trial" and found that trial counsel were not deficient. (PC App. at 665-66). The Indiana Supreme Court affirmed Judge Humphrey's conclusion that trial counsel were not deficient in their presentation of evidence regarding Mr. Pruitt's mental illness. Pruitt II, 903 N.E.2d at 921 ("We also agree with the PC court's conclusion that a different diagnosis 'does not show that trial counsel were deficient.'") (quoting PC App. at 674).

Strickland v. Washington, much like Mr. Pruitt's argument here, stemmed from a petitioner's claim about counsel's presentation of mitigation evidence. The Court held that "counsel has a duty to make reasonable investigations or to make a reasonable decision that makes particular investigations unnecessary" and "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." 466 U.S. at 690-691. The Strickland Court found that counsel's decision not to seek more character or psychological evidence and to argue instead for the extreme emotional distress mitigating circumstance and to rely as fully as possible on petitioner's  acceptance of responsibility for his crimes was "well within the range of professionally reasonable judgments." Id. at 699. The Court also found no prejudice, noting that the additional evidence "would barely have altered the sentencing profile" of petitioner and that "[g]iven the overwhelming aggravating factors, there is no reasonable probability that the omitted evidence would have changed the conclusion that the aggravating circumstances outweighed the mitigating circumstances." Id. at 700.

An ineffective assistance of counsel claim about "a particular decision not to investigate must be directly assessed for reasonableness in all the circumstances, applying a heavy measure of deference to counsel's judgments." Id. at 691. In the context of mitigation proceedings in death penalty cases, counsel has an "obligation to conduct a thorough investigation of the defendant's

background." Williams v. Taylor, 529 U.S. 362, 396 (2000). But "Strickland does not require counsel to investigate every conceivable line of mitigating evidence no matter how unlikely the effort would be to assist the defendant at sentencing." Wiggins v. Smith, 539 U.S. 510, 533 (2003). Indeed, "[t]here comes a point where a defense attorney will reasonably decide that another strategy is in order, thus 'mak[ing] particular investigations unnecessary.'" Cullen v. Pinholster, 131 S. Ct. at 1407 (*quoting* Strickland, 466 U.S. at 691) (brackets in original). And "[t]hose decisions are due a 'heavy measure of deference.'" Id. at 1408 (*quoting* Strickland, 466 U.S. at 691). In Cullen v. Pinholster, the Supreme Court held that it was reasonable for the California Supreme Court to conclude that trial counsel was not deficient for electing to present a family-sympathy mitigation defense instead of further investigating petitioner's background and mental state. Id. at 1403-1404.

The Indiana Supreme Court's determination that Mr. Pruitt's trial counsel weren't deficient in their presentation of evidence about Mr. Pruitt's mental illness is not unreasonable. Trial counsel investigated Mr. Pruitt's mental state, including evidence of mental illness. (PC Tr. at 240-241). Mr. Pruitt's expert witness, Dr. Golden, testified at trial that the Psychological Services Unit of the Federal Bureau of Prisons diagnosed Mr. Pruitt as having a "schizotypal personality disorder . . . an Axis 2 mental illness" in 1996 while he was imprisoned for another offense. (Trial Tr. at 6043). Dr. Golden explained that "psychotic episodes should be the

exception rather than the rule" for those with this disorder, and that if these episodes "were the main symptoms, then you would be diagnosing him as schizophrenic or something similar to that." (Id. at 6045–6046). Dr. Golden also testified on direct examination that about two months after Mr. Pruitt was arrested for Officer Starnes's murder, an Indiana Department of Corrections psychologist diagnosed Pruitt as suffering from "schizophrenia, chronic undifferentiated type compensated residual." (Id. at 6053). Dr. Golden explained that this diagnosis means that the psychologist "thinks that at one time that he [Pruitt] was actually schizophrenic . . . but that right now most of those serious symptoms are not showing and . . . he's somewhere now in between a personality disorder and the Axis 1 schizophrenia." (Id. at 6054). In other words, "[h]e's not suggesting he's actively schizophrenic, but he is expressing his belief that he is capable of easily becoming schizophrenic at some time in the future." (Id. at 6055). Dr. Golden concluded that Pruitt's mental illness is "in the schizophrenia spectrum of disorders," but his opinion was that the illness is "not severe enough to be called schizophrenic, so I go with the schizotypal or the schizoid diagnosis." (Id. at 6057).

Mr. Pruitt's cited cases are largely instances in which trial counsel completely failed to investigate or present evidence in mitigation about significant mitigating circumstances. See Porter v. McCollum, ---U.S.---, 130 S. Ct. 447, 453 (2009) (per curiam) (finding counsel deficient for "ignor[ing] pertinent avenues for

investigation of which he should have been aware," such as petitioner's court-ordered competency evaluations); Rompilla v. Beard, 545 U.S. 374, 383 (2005) (finding counsel deficient for failing to investigate significant mitigating evidence concerning petitioner's background contained in petitioner's prior conviction file which counsel neglected to review); Wiggins v. Smith, 539 U.S. at 524 (finding counsel deficient for having "abandoned their investigation of petitioner's background after having acquired only rudimentary knowledge of his history from a narrow set of sources"); Williams v. Taylor, 529 U.S. at 395-396 (finding counsel ineffective for failing to prepare for sentencing until one week beforehand, to uncover extensive records graphically describing petitioner's nightmarish childhood, to introduce evidence that petitioner was borderline mentally retarded, and to uncover evidence of petitioner's positive behavior during incarceration). That simply isn't what happened in Mr. Pruitt's case. Mr. Pruitt's trial counsel not only investigated his mental illness, they presented evidence of his mental condition at trial. Dr. Golden described Mr. Pruitt's mental state in detail and concluded that Mr. Pruitt suffered from schizotypal personality disorder.

Our court of appeals recently considered a nearly identical argument in Overstreet v. Wilson, 686 F.3d 404 (7th Cir. July 11, 2012). The petitioner in that case contended that his trial counsel were ineffective for not eliciting testimony that petitioner was actually suffering from schizophrenia on Axis I of the DSM-IV, rather than schizotypal personality disorder on Axis II. Id. at *3. Counsel

presented expert testimony that petitioner suffered from a schizotypal personality disorder. Id. The court of appeals rejected petitioner's argument, agreeing with the state courts and district court that counsel's performance was not ineffective. Id.

Mr. Pruitt cites no cases standing for the proposition that trial counsel are *de facto* ineffective in presenting expert testimony if other experts later reach different conclusions that might be more favorable to the defense. The court agrees with Mr. Pruitt's assertion of what trial counsel knew about Mr. Pruitt's mental illness leading up to trial—that Mr. Pruitt had been diagnosed with schizophrenia and that Dr. Olvera recommended that counsel have Mr. Pruitt evaluated by a mental health professional with expertise in schizophrenia. The court disagrees with Mr. Pruitt's assertion that this knowledge should have prompted reasonable counsel to take a different course of action than trial counsel's decision to hire Drs. Hudson and Golden to evaluate Mr. Pruitt's mental state. *See, e.g.*, Campbell v. Coyle, 260 F.3d 531, 555 (6th Cir. 2001) (concluding that "it was objectively reasonable for [petitioner's] trial counsel to rely upon Dr. Chiappone's diagnosis and, further, trial counsel's failure to independently diagnose PTSD was not unreasonable"). Mr. Pruitt's trial counsel employed a reasonable trial strategy of focusing more heavily on Mr. Pruitt's mental retardation than Mr. Pruitt's mental illness. The Indiana Supreme Court's determination that trial counsel were not ineffective in their presentation of evidence of mental illness withstands AEDPA scrutiny.

Mr. Pruitt can't satisfy the prejudice prong because he hasn't demonstrated a reasonable probability that a "battle of the experts" over the severity of Mr. Pruitt's mental illness would have been enough to alter the jury's sentencing determination. To show a reasonable probability that the different diagnosis would have affected the outcome of the trial, the "psychiatric testimony must do more than have some conceivable effect on the proceeding"; Mr. Pruitt "must affirmatively prove that its omission undermined the jury's verdict." MacDougall v. McCaughtry, 951 F.2d 822, 826 (7th Cir. 1992). In Overstreet v. Wilson, the court of appeals found that the petitioner didn't satisfy the prejudice prong because it the petitioner in that case failed to provide sufficient evidence that "psychiatric testimony affects juries." 686 F.3d at 408. To show that the distinction between a diagnosis of schizotypal personality disorder and schizophrenia would have impacted the jury's sentencing decision, Mr. Pruitt needs "evidence showing . . . that jurors would be less likely to recommend death for a defendant who has schizophrenia" as opposed to schizotypal personality disorder. 686 F.3d at 409-410.

Mr. Pruitt hasn't provided evidence that testimony about schizophrenia would have altered the jury's sentencing decision. In fact, additional testimony about the degree of Mr. Pruitt's mental illness "would barely have altered the sentencing profile" of Mr. Pruitt. See Strickland v. Washington, 466 U.S. at 700. Additional testimony beyond that of Dr. Golden further delineating the severity of

Mr. Pruitt's illness doesn't create a reasonable probability that the jury's outcome would have been different.

### 2. Introduction Of A Written Social History

Mr. Pruitt takes issue with trial counsel's use of mitigation expert Cheri Guevara. Ms. Guevara gathered records about Mr. Pruitt's background and interviewed potential mitigation witnesses, but trial counsel didn't ask Ms. Guevara to draft a social history or testify at trial. Mr. Pruitt maintains that his attorneys fell below the constitutional standard by not presenting a comprehensive, written social history. The Indiana Supreme Court rejected Mr. Pruitt's contention on post-conviction review. Pruitt II, 903 N.E.2d at 923-924. The court found that counsel investigated and introduced through various lay and expert witnesses a wealth of information describing Mr. Pruitt's social history.

Mr. Pruitt's contention that trial counsel were deficient for not asking Ms. Guevara to draft a written social history or testify at trial has no merit. Mr. Pruitt's experts had ample social history from which to base their conclusions, and the jury heard testimony from several witnesses, including several of Mr. Pruitt's family members, about Mr. Pruitt's background. Trial counsel presented testimony about Mr. Pruitt's educational history from a number of witnesses and "explored in great detail Pruitt's social history (which included, *inter alia,* his family background, formative childhood experiences, characteristic documented

behaviors as an adult, and his work history). Dr. Hudson testified on direct examination to Pruitt's work history." Id. at 923. The Indiana Supreme Court noted some specifics of the extensive testimony about Mr. Pruitt's social history presented during the penalty phase:

> During the penalty phase of trial, Pruitt's relatives (mother Rena, brother Mark, father Marion, and sisters Jennifer and Francine) corroborated the previous trial testimony about his educational and social history. Also during the penalty phase, trial counsel presented extensive testimony about Pruitt's family history. On direct examination, Pruitt's mother Rena Pruitt testified that she had had physical fights with his father Marion "[p]robably every weekend" when he was growing up. (Trial Tr. 5023.) She also testified that her brother "slapped Tommy [Pruitt] in the face once," id. at 5037, and that after this incident Pruitt had almost gotten into a violent fight with her brother, id. at 5038. On direct examination, Pruitt's father Marion Pruitt testified that he often would get frustrated at his son, resulting in physical and verbal abuse. See id. at 5196 ("he'd take a drink of [gasoline] or something like that, you know, and I called him retarded"; "I'd get drinking, you know, and call him bad names"). He acknowledged that he and Pruitt's mother divorced when Pruitt was in his late teens because he "was drinking too much and playing around with the women." Id. at 5182–83. He also testified that when Pruitt was a toddler and was injured in an accident that required hospitalization, he only had "[a]bout five or $10" set aside to pay for medical care. Id. at 5181. Both Pruitt's mother and sister Jennifer testified that his father was paranoid that "somebody's out to get him." Id. at 5025, 5244.

Id. at 924.

In short, the written social history did not contain different information about Mr. Pruitt's background than that offered through testimony at trial. The Indiana Supreme Court summarized the extensive evidence about Mr. Pruitt's

background, and the supreme court's determination that counsel's performance was not deficient is not unreasonable.

### *F. Claim VII: Ineffective Assistance Of Counsel: Pursuit Of Guilty But Mentally Ill Verdict*

Mr. Pruitt claims his trial counsel should have pursued a "Guilty But Mentally Ill" verdict instruction during the guilt phase of trial in light of evidence of Mr. Pruitt's mental illness. A guilty-but-mentally-ill defense "is available in cases in which a defendant 'was mentally ill but able to distinguish right from wrong at the time of the offense.'" Stevens v. McBride, 489 F.3d 883, 893 (7th Cir. 2007) (*quoting* Weeks v. State, 697 N.E.2d 28, 29 (Ind. 1998)). Under Indiana law, the court must sentence a guilty-but-mentally-ill defendant "in the same manner as a defendant found guilty of the offense." IND. CODE § 35-36-2-5(a). The Indiana supreme court has noted that although a jury finding of guilty-but-mentally-ill "does not guarantee a defendant that the death penalty will not be imposed . . . as a practical matter, defendants found to be guilty but mentally ill of death-penalty-eligible murders normally receive a term of years or life imprisonment." Prowell v. State, 741 N.E.2d 704, 717 (Ind. 2001).

In post-conviction proceedings, Mr. Pruitt's trial counsel testified that he never considered pursuing a guilty-but-mentally-ill verdict. Counsel outlined his trial strategy, stating that his first priority was to prove that Mr. Pruitt "was mentally retarded because this factor would have 'great mitigating weight.'" Pruitt

II, 903 N.E.2d at 922 (*quoting* PC Tr. at 214–15.) Counsel's "second priority was to prove that 'Pruitt was suffering from a serious mental illness at or around the time of the crime' by presenting Indiana DOC records, Federal BOP records, Pruitt's bizarre behavior before the crime, and the facts and circumstances surrounding the crime." Id. (*quoting* Trial Tr. at 215).

The Indiana Supreme Court rejected this claim on post-conviction review, finding that Mr. Pruitt had simply recapitulated his claim that trial counsel were ineffective in their presentation of evidence of Mr. Pruitt's mental illness. Id. ("Pruitt's argument is not so much that it constituted ineffective assistance of counsel for trial counsel not to have pursued a GBMI verdict as it was for trial counsel not to have presented the quantum of mental illness evidence necessary to mitigate a death sentence.").

Indiana Code § 35-36-2-3 provides:

> In all cases in which the defense of insanity is interposed, the jury (or the court if tried by it) shall find whether the defendant is:
> (1) guilty;
> (2) not guilty;
> (3) not responsible by reason of insanity at the time of the crime; or
> (4) guilty but mentally ill at the time of the crime.

Although not the grounds upon which the Indiana Supreme Court dismissed this claim, Indiana law requires an insanity defense for guilty-but-mentally-ill to be a verdict option. In Baer v. State, 942 N.E.2d 80 (Ind. 2011), the court considered a post-conviction petition in a death penalty case in which the petitioner argued that his trial counsel was ineffective for seeking a guilty-but-

mentally-ill verdict and not withdrawing an insanity defense. The court rejected this claim and noted that

> . . . the Indiana Code provides only two ways that a defendant can be found GBMI. First, a defendant may seek to plead GBMI if that plea is voluntary and supported by an adequate factual basis. Second, a jury can return a GBMI verdict if the defendant interposes the insanity defense. The instant argument is that counsel should have tried to create a third way by asking to pursue GBMI without a plea of insanity in place.

Id. at 95 (citations omitted). Accord, Overstreet v. Superintendent, Case No. 3:08-CV-226, 2011 WL 836800 at *28 (N.D. Ind. Mar. 4, 2011) ("A GBMI verdict is not a generally available alternative to a guilty verdict, but rather it is applicable only when '*the defense of insanity is interposed.*'") (*quoting* IND. CODE § 35-36-2-3), affirmed as to other claims in Overstreet v. Wilson, 686 F.3d 404 (7th Cir. July 11, 2012).

Mr. Pruitt doesn't contend that his counsel should have or could have presented an insanity defense. He doesn't indicate that experts were willing to testify that Mr. Pruitt was insane, even though many behavioral and psychological experts evaluated him. Because Mr. Pruitt did not (and could not) assert an insanity defense, it wasn't possible for him to obtain a jury verdict of guilty-but-mentally-ill, and his trial counsel weren't ineffective for not attempting to obtain such a verdict.

Even if Indiana law permitted a guilty-but-mentally-ill verdict without raising an insanity defense, the Indiana Supreme Court's determination that trial

counsel were not ineffective for not requesting a guilty-but-mentally-ill verdict was reasonable. Mr. Pruitt's trial counsel testified that their trial strategy was to first and foremost, establish that Mr. Pruitt is mentally retarded because such a finding would have "great mitigating weight." (PC Tr. at 214-215). Trial counsel's second priority was to show that Mr. Pruitt suffered from "serious mental illness at or around the time of the crime" by presenting prison records and describing Mr. Pruitt's bizarre behavior before the crime, as well as the facts and circumstances surrounding the crime. (PC Tr. at 215). The Indiana Supreme Court noted that "trial counsel made a deliberate strategic decision to concentrate the jury's attention on Pruitt's claim of mental retardation. We agree that this strategy might well have been undermined by greater emphasis on the much weaker mental illness evidence." Pruitt II, 903 N.E.2d at 922. The court's determination that Mr. Pruitt's trial counsel pursued a sound trial strategy was not unreasonable.

### G. Claim VIII: Ineffective Assistance Of Counsel: Prosecutorial Misconduct Claims

Mr. Pruitt claims that his attorneys should have raised objections at trial and on appeal to the prosecutor's reading of a poem and to the prosecutor's comparison of Mr. Pruitt to notorious murderers. He argues that his attorneys' errors prejudiced him because the statements amounted to prosecutorial

misconduct which violated Mr. Pruitt's Sixth, Eighth, and Fourteenth Amendment rights.[6]

### 1. Comparison to Notorious Murderers

In the prosecution's rebuttal, the prosecutor likened Mr. Pruitt to notorious murderers, telling the jury: "Let me tell you, Jeffrey Dahlmer (sic), Ted Bundey (sic), Adolph Hitler, Tim McVey, the list goes on and on. All those grade school pictures. It's not where you started life, ladies and gentlemen, it's what choices you make." (Id. at 6355). Mr. Pruitt's trial counsel didn't object to this statement. The Indiana Supreme court found that Mr. Pruitt had waived any ineffective assistance of counsel claim related to counsel's failure to object to the prosecutor's statements comparing Mr. Pruitt to notorious murderers because Mr. Pruitt didn't raise the argument in his post-conviction petition, raising it instead for the first time during his post-conviction appeal to the Indiana Supreme Court. Pruitt II, 903 N.E.2d at 930. In his traverse brief, Mr. Pruitt contends that his post-conviction petition raised the issue; he cites his motion for leave to amend petition for post-conviction relief (filed February 16, 2007) (PC App. at 446). (Doc. No. 31 at 94). But Judge Humphrey denied that motion to amend. (PC App. at 647).

A federal court generally can't grant habeas relief if the state court's decision was based on an adequate and independent state law ground. Promotor v. Pollard,

---

[6] To the extent Mr. Pruitt raises stand-alone claims of prosecutorial misconduct, he is procedurally barred from doing so for failing to raise such stand-alone claims on direct appeal.

628 F.3d 878, 885 (7th Cir. 2010). "An adequate and independent state law ground does not, however, absolutely preclude review of a procedurally defaulted claim during federal habeas review." Id. A state law ground is independent "when the court actually relied on the procedural bar as an independent basis for its disposition." Kaczmarek v. Rednour, 627 F.3d 586, 592 (7th Cir. 2010). A state law ground is adequate when it "is a firmly established and regularly followed state practice at the time it is applied." Id.

No basis exists for federal circumvention of the state waiver rule. The Indiana Supreme Court noted that Mr. Pruitt failed to raise an ineffective assistance of counsel claim in connection with the prosecutor's comparisons to convicted murderers in his post-conviction petition. Mr. Pruitt says that was wrong because he raised it in his motion to amend. That motion was denied, and the petition wasn't amended. The post-conviction petition never raised the issue, and Mr. Pruitt didn't appeal the denial of the motion to amend. The Indiana Supreme Court resolved the claim by applying Indiana's waiver doctrine, a doctrine that constitutes an independent and adequate grounds. *See* id. Mr. Pruitt's claim about the prosecutor's comparison to notorious murderers is procedurally barred.

## 2. Recitation of the Poem

During final arguments of the penalty phase of trial, the prosecutor began reciting a poem entitled "A Part of America Died," which addresses the impact of a police officer's death on society. The relevant portion of the transcript reads as follows:

> SONNEGA: I'd like to sum up with the words of a simple poem, Part of America Died. "Somebody killed a policeman today and part of America died. A piece of our country he swore to protect, will be buried by his side. The suspect who shot him will stand up in court, with counsel demanding his rights, while a young widow mother must work for her kids--"
>
> * * *

(Trial Tr. at 6293). At this juncture, Mr. Pruitt's trial counsel objected to the reading of the poem, arguing at sidebar that the poem was an argument concerning victim impact, which Judge Humphrey already had ruled was not allowed. (*See* id. at 1785 and 3436). Judge Humphrey asked Mr. Pruitt's attorney whether he wanted the court to admonish the jury in light of the prosecutor's statements. Counsel declined, saying that "[a]nything that we do is only going to service to highlight it," but counsel moved for a mistrial, which Judge Humphrey denied. (Id. at 6294-6295). The sidebar conference ended with the prosecutor's promise that he was "done with that" and that he "wo[uld]n't read it." (Id. at 6295). Surprisingly,[7] the prosecutor resumed the poem as soon as the sidebar ended.

> SONNEGA: "The beat that he walked was a battlefield, too, just as if he's gone off to war. Though the flag of our nation won't fly at half

---

[7] In fairness to the prosecutor, the rest of the poem doesn't appear to address victim impact.

mast to his name, they will add the star. Yes, somebody killed a policeman today, in your town or mine. While we slept in comfort, behind our locked doors, a cop put his life on the line. Now with those who walk a beat on a dark city street, as he stands at each new rookies' side, he answered the call, of himself he gave all, and part of America died."

(Id. at 6295-6296).

The Indiana Supreme Court concluded on post-conviction review that trial counsel and appellate weren't deficient for failing to object to the renewed reading of the poem and for failing to raise an ineffective assistance of counsel claim on direct appeal because the poem's reading didn't constitute misconduct "which placed Pruitt in grave peril." Pruitt II, 903 N.E.2d at 928.

To establish ineffective assistance of appellate counsel for failing to raise the prosecutorial misconduct claim on direct appeal, Mr. Pruitt must show that: (1) his counsel's performance was so deficient as to fall below an objective standard of reasonableness under prevailing professional norms; and (2) the deficient performance prejudiced Mr. Pruitt. See Lee v. Davis, 328 F.3d 896, 900 (7th Cir. 2003). Appellate counsel's failure to raise an issue on appeal requires the court to "compare the issue not raised in relation to the issues that were raised; if the issue that was not raised is both obvious and clearly stronger than the issues raised, the appellate counsel's failure to raise the neglected issue is objectively deficient." Id. at 900-901 (internal citation and quotation marks omitted). The Indiana Supreme Court determined that trial and appellate counsel's performances were not deficient because "the prosecutor's reading of 'Part of

America Died' did not constitute misconduct which placed Pruitt in grave peril such that a mistrial was required" and because trial counsel declined an admonishment, no meritorious issues were available for appeal. Pruitt II, 903 N.E.2d at 930. The court's determination that counsel were not ineffective is not unreasonable.

In addition, Mr. Pruitt hasn't established that a reasonable probability exists that the outcome of the trial or the appeal would have differed had trial and appellate counsel raised this prosecutorial misconduct issue at every opportunity. Indiana courts reviewing prosecutorial misconduct claims engage in a two-step analysis: "(1) whether the prosecutor engaged in misconduct, and if so, (2) whether the misconduct, under all of the circumstances placed the defendant in a position of grave peril to which he should not have been subjected." Carter v. State, 956 N.E.2d 167, 169 (Ind. Ct. App. 2011). "The gravity of the peril turns on the probable persuasive effect of the misconduct on the jury's decision, not on the degree of impropriety of the conduct." Id. Misconduct occurs when a prosecutor requests that the jury convict a defendant for "any reason other than his guilt." Id. at 170.

The Indiana Supreme Court decided counsel weren't ineffective because the reading of the poem didn't put Mr. Pruitt in "a position of grave peril." Pruitt II, 903 N.E.2d at 930. In his traverse brief, Mr. Pruitt argues that "the Indiana Supreme Court unreasonably determined whether the improper comment harmed

Petitioner under a 'grave peril' standard. This is not the applicable constitutional test f[ro]m <u>Darden</u> or even <u>Strickland</u>, given the appellate ineffectiveness aspect to the claim." (Doc. No. 31 at 91). Mr. Pruitt argues that AEDPA deference to the Indiana Supreme Court's conclusion doesn't constrain this court. Indeed the "grave peril" standard is derived from Indiana case law.

Mr. Pruitt's constitutional claim in his petition to this court is ineffective assistance of counsel for failing to pursue prosecutorial misconduct at trial and on direct appeal. A federal court evaluating counsel's performance assesses whether Mr. Pruitt's prosecutorial misconduct claim would have succeeded under Indiana's "grave peril" standard. *See* <u>Carter v. State</u>, 956 N.E.2d at 169.

In any event, the two-step "grave peril" analysis that Indiana courts apply to prosecutorial misconduct claims mirrors the federal standard. Both standards evaluate whether misconduct occurred and then whether the misconduct prejudiced the defendant such that the result was a denial of due process. Under federal law, a claim of prosecutorial misconduct is evaluated under the two-step framework established by the Supreme Court in <u>Darden v. Wainwright</u>, 477 U.S. 168, 180-181 (1986). First, the court first looks to the challenged comments to decide whether they were improper. <u>Id.</u> If so, the court then evaluates whether the defendant was prejudiced by the comments. <u>Id.</u> The court considers six factors under this step: "'(1) whether the prosecutor misstated the evidence, (2) whether the remarks implicate specific rights of the accused, (3) whether the defense

invited the response, (4) the trial court's instructions, (5) the weight of the evidence against the defendant, and (6) the defendant's opportunity to rebut.'" Ruvalcaba v. Chandler, 416 F.3d 555, 565 (7th Cir. 2005) (*quoting* Howard v. Gramley, 225 F.3d 784, 793 (7th Cir. 2000)). To decide whether the remarks were prejudicial, "it is not enough that the prosecutors' remarks were undesirable or even universally condemned. The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." Darden v. Wainwright, 477 U.S. at 181 (internal quotations and citations omitted).

Assuming the poem was improper, Mr. Pruitt still couldn't sustain a misconduct claim because the poem was not prejudicial: it did not "so infect[] the trial with unfairness" so as to make the jury's sentencing determination a denial of due process. *See* Darden v. Wainwright, 477 U.S. at 181. The poem was brief and not personalized to either Mr. Pruitt or Deputy Starnes. Judge Humphrey made clear to the jury that closing arguments are not evidence in his instructions to them. (*See* Trial Tr. at 4882) ("The unsworn statements or comments of Counsel on either side of the case should not be considered as evidence in this case."). Judge Humphrey also told the jury not to consider any circumstances to support a finding of death or life without parole beyond the aggravating circumstance charged in the information. (*See* Trial Tr. at 6374-6375) ("You are not permitted to consider any circumstances as weighing in favor of the sentence of death or life

imprisonment without parole, other than the aggravating circumstance specifically charged by the State in the charging information."). Further, trial counsel declined Judge Humphrey's offer of a curative instruction, supporting the conclusion that the poem was not so impactful that it could have infected the trial with unfairness. Finally, given the weight of the evidence of the aggravating circumstance and the nature of the crime, the court can't reasonably conclude that the reading of the poem had a palpable impact on the jury's decision. Because the underlying prosecutorial misconduct claim fails, Mr. Pruitt's appellate counsel were not ineffective for not raising the claim on direct appeal.

## H. Claim IX: Weighing Of Aggravators And Mitigators

Mr. Pruitt contends that Indiana Code § 35-50-2-9 is unconstitutional, arguing that <u>Blakely v. Washington</u>, 542 U.S. 296 (2004), <u>Ring v. Arizona</u>, 536 U.S. 584 (2002), and additional Supreme Court precedent require the jury to find beyond a reasonable doubt that the aggravating factors outweigh any mitigating factors before a sentence of death can be imposed. The jury wasn't so instructed, and Indiana law doesn't require such an instruction.

Indiana law authorizes the death penalty if one or more of the "aggravating circumstances" listed in Indiana Code § 35-50-2-9(b) is found to be present beyond a reasonable doubt. The aggravating circumstance was that Deputy Starnes was a law enforcement officer acting in the course of his duty at the time

he was murdered. *See* IND. CODE § 35-50-2-9(b)(6). If an eligibility factor exists, the defendant is then "death eligible," that is, the jury may recommend the death penalty. IND. CODE § 35-50-2-9(e), (l)(1). Once a defendant is "death eligible," death may be imposed only if the jury determines that the aggravating circumstance (or circumstances in another case) outweighs any mitigating circumstances that exist. IND. CODE § 35-50-2-9(l)(2). The statute doesn't say what standard governs the weighing process. *See* <u>Pruitt I</u>, 834 N.E.2d at 112 (*citing* <u>Ritchie v. State</u>, 809 N.E.2d 258, 268 (Ind. 2004)).

The Indiana Supreme Court rejected Mr. Pruitt's constitutional challenge on direct appeal. <u>Pruitt I</u>, 834 N.E.2d at 112. The court cited <u>Ritchie v. State</u>, 809 N.E.2d 258, 268 (Ind. 2004), in which the court upheld the constitutionality of Indiana's death penalty statute, finding that "[o]nce a statutory aggravator is found by a jury beyond a reasonable doubt, the Sixth Amendment as interpreted by <u>Ring</u> and <u>Apprendi</u> is satisfied."

The Indiana supreme court's disposal of this claim was not an unreasonable application of clearly established federal law. The Sixth Amendment guarantees a defendant "a jury determination that [he] is guilty of every element of the crime with which he is charged, beyond a reasonable doubt." <u>United States v. Gaudin</u>, 515 U.S. 506, 510 (1995). A review of Sixth Amendment jurisprudence reveals that a jury must find beyond a reasonable doubt any fact which makes a defendant eligible for the death penalty, and the jury' finding that made Mr. Pruitt

eligible for the death penalty—that Deputy Starnes was a police officer killed in the line of duty—was found beyond a reasonable doubt. *See* Ring v. Arizona, 536 U.S. at 589.

In Apprendi v. New Jersey, 530 U.S. 466, 490 (2000), the Court expressly held that "[o]ther than the fact of a prior conviction, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." The Court explained that "the relevant inquiry is not of form, but of effect—does the required finding expose the defendant to a greater punishment than that authorized by the jury's guilty verdict?" Id. at 494. In Ring v. Arizona, the Court applied its holding in Apprendi to capital defendants, holding that capital defendants "are entitled to a jury determination of any fact on which the legislature conditions an increase in their maximum punishment." 536 U.S. at 589. The issue before the Ring Court was whether Arizona law, under which a sentencing judge, sitting without a jury, could find an aggravating circumstance necessary for the imposition of the death penalty violated the Sixth Amendment. The Court held that "[b]ecause Arizona's enumerated aggravating factors operate as 'the functional equivalent of an element of a greater offense,' the Sixth Amendment requires that they be found by a jury." Id. at 609 (*quoting* Apprendi, 530 U.S. at 494 n.19).

Under Apprendi "the relevant inquiry is not of form, but of effect—does the required finding expose the defendant to a greater punishment than that

authorized by the jury's guilty verdict?" 530 U.S. at 494. The factual finding that made Mr. Pruitt eligible for the death penalty is that Deputy Starnes was a police officer killed during the course of his duties. The jury found that the state proved this fact beyond a reasonable doubt; that finding authorized the death penalty. The jury's weighing of the aggravating factor and mitigating factors didn't expose Mr. Pruitt to a punishment greater than that to which he already was exposed once the jury found beyond a reasonable doubt that Mr. Pruitt's victim was a law enforcement officer.

The state cites Kansas v. Marsh, 548 U.S. 163 (2006), as dispositive authority on this claim. In that case the Court concluded that Kansas's sentencing scheme placing the burden on a defendant to prove that mitigating circumstances outweighed aggravating circumstances didn't violate the Eighth and Fourteenth Amendments. Id. at 173. The Court relied on its reasoning in Walton v. Arizona, 497 U.S. 639, 650 (1990), overruled on other grounds, Ring, 536 U.S. 584, in which the Court held that "a defendant's constitutional rights are not violated by placing on him the burden of proving mitigating circumstances sufficiently substantial to call for leniency."

Marsh and Walton addressed challenges to burden of proof allocations under the Eighth Amendment. These cases foreclose an Eighth Amendment challenge to Indiana's burden of proof. In response to the state's citations to Marsh and Walton, Mr. Pruitt argues in his Traverse brief that his challenge to the

burden of proof is premised on Sixth Amendment jurisprudence, not Eighth Amendment jurisprudence. (Doc. No. 31 at 104). As already discussed, Sixth Amendment jurisprudence is no more beneficial to Mr. Pruitt's argument. Mr. Pruitt's claim fails under both the Sixth Amendment and the Eighth Amendment.

## IV. Certificate of Appealability

Under Rule 11 of the Rules Governing Section 2254 Cases, this court must consider whether to grant Mr. Pruitt a certificate of appealability ("COA"). To obtain a COA, pursuant to 28 U.S.C. § 2253(c)(2), a petitioner must make a substantial showing of the denial of a constitutional right by establishing "that reasonable jurists could debate whether (or for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were adequate to deserve encouragement to proceed further." Slack v. McDaniel, 529 U.S. 473, 484 (2000).

Mr. Pruitt continues to pursue eight of the nine claims[8] he raised in his habeas corpus petition. As explained below, the court will grant Mr. Pruitt a COA as to Claims I, II, (with the exception of the procedurally defaulted argument concerning a return to special education classes), VI, and VIII.

*Claim I* – Because Mr. Pruitt advances a new nuanced legal theory regarding mental retardation and the Eighth Amendment and because reasonable jurists

---

[8] Mr. Pruitt abandoned Claim IV in his Traverse brief. (Doc. No. 31 at 61).

could debate whether the Indiana supreme court properly applied Eighth Amendment jurisprudence, the court will issue a COA as to this claim.

*Claim II* – Reasonable jurists could debate whether the Indiana supreme court properly applied <u>Strickland</u> to these ineffective assistance of counsel claims. The court will issue a COA, with the exception of the procedurally defaulted argument regarding a return to special education classes (as discussed <u>supra</u> in Part III.B.2).

*Claim III* – Reasonable jurists cannot debate that Ms. Calderone's testimony was irrelevant during the guilt phase of trial. The court will not issue a COA as to this claim.

*Claim V* – Reasonable jurists cannot debate that the clemency instruction was constitutional under federal law. The court will not issue a COA as to this claim.

*Claim VI* – Reasonable jurists could debate whether the Indiana supreme court properly applied <u>Strickland</u> to this claim. The court will issue a COA as to this claim.

*Claim VII* – It is not debatable that Mr. Pruitt did not and could not have presented an insanity defense. Because a guilty-but-mentally-ill jury verdict is only available when the insanity defense is interposed, reasonable jurists cannot disagree that trial counsel could not have been ineffective for failing to ask for the verdict. The court will not issue a COA on this claim.

*Claim VIII* – Because this claim contains several procedural hurdles, there are many steps at which reasonable jurists could debate. The court will issue a COA as to this claim.

*Claim IX* – It is not debatable that the weighing of mitigators and aggravators is not a fact subject to determination beyond a reasonable doubt. The court will not issue a COA as to this claim.

## V. Conclusion

For the foregoing reasons, Mr. Pruitt's petition for a writ of habeas corpus (Doc. No. 14) is DENIED. A certificate of appealability is GRANTED as to Claims I, II (in part), VI, and VIII but DENIED as to Claims III, V, VII, and IX.

IT IS SO ORDERED.

ENTERED: __October 2, 2012_____

_____/s/ Robert L. Miller, Jr._____
Robert L. Miller, Jr., Chief Judge
United States District Court